In the Supreme Court of Georgia

Decided: October 19, 2015

S15A0937. JOHNSON v. THE STATE.

NAHMIAS, Justice.

Appellant Farren Johnson was found guilty but mentally ill of malice murder and other crimes in connection with the shooting death of his stepfather, Clarence Alston. On appeal, his only contention is that the trial court erred when it denied his request to charge the jury on voluntary manslaughter. Finding no such error, we affirm.[1]

1. Viewed in the light most favorable to the verdicts, the evidence at trial showed the following. Appellant, who was 24 years old at the time of the

---

[1] The victim was killed on May 28, 2008. On August 20, 2008, a Chatham County grand jury indicted Appellant for malice murder, felony murder, aggravated assault, and two counts of possession of a firearm during the commission of a crime. At a trial from April 23 to 26, 2013, the jury found Appellant guilty but mentally ill at the time of the crime on all charges. See OCGA § 17-7-131 (g) (1) ("A defendant who is found guilty but mentally ill at the time of the felony . . . shall be committed to an appropriate penal facility and shall be evaluated [and] then treated, if indicated, within the limits of state funds appropriated therefor, in such a manner as is psychiatrically indicated for his or her mental illness . . . ."). On May 13, 2013, the trial court sentenced Appellant to serve life in prison for malice murder plus five years for one firearm conviction. The felony murder verdict was vacated by operation of law, and the remaining counts merged. On May 15, 2013, Appellant filed a motion for new trial, which he amended on August 8, 2014. After an evidentiary hearing, the trial court denied the motion on December 5, 2014. Appellant filed a timely notice of appeal, and the case was docketed in this Court for the April 2015 term and submitted for decision on the briefs.

shooting, lived in a duplex in Savannah with his mother, Monica Johnson ("Ms. Johnson"), and the victim. Police had been called to the duplex several times due to fights between Appellant and the victim. Appellant, who believed the victim was using his mother financially, typically instigated the altercations, which usually ended with the victim pinning Appellant to the floor until he calmed down. On two occasions, Appellant threatened to kill the victim. In the months leading up to the shooting, Ms. Johnson had been telling Appellant that he needed to move out of her house and find his own way. Ms. Johnson was in the process of finding a new place to live and had told both Appellant and the victim that she was going to leave. She found a new place to live and arranged for the furniture rental company to pick up the furniture in the duplex. The furniture was removed on the afternoon of May 28, 2008.

That evening around 8:30 p.m., Ms. Johnson returned home from work and found Appellant standing outside. Before she could enter the house, Appellant stopped her, told her not to go inside, and asked her to call 911. When she asked why, Appellant said, "I did something wrong. I did something bad." Ms. Johnson told Appellant to call the police since he knew what had happened. Appellant then called 911 and said that he shot the victim in the

2

head. Ms. Johnson asked Appellant why he shot the victim, and Appellant said, "[b]ecause he was taking you away from me." When the police arrived, Appellant told them, "I shot him. He's inside the house. . . . I shot him in the head. I killed him. He was trying to kill my mother." Officers found the victim inside the duplex, lying dead in a pool of blood that had begun to coagulate and crust over. The police also found a .38 caliber gun on the front porch; Appellant had purchased the gun nine days earlier and the key to its hammer lock was found in his pocket. Appellant was arrested and taken to the police station, where he was interviewed.

In the video-recorded interview, which was played for the jury at trial, Appellant said that he had come home around 6:00 p.m. and discovered the furniture missing and the victim sitting in a lawn chair inside the duplex, watching television, drinking a beer, and laughing. Appellant claimed that he became angry because he believed the furniture had been repossessed due to the victim's lack of financial responsibility and the victim was laughing about it. Appellant then went to his room, took out his new gun, unlocked the hammer with the safety key, loaded it, and went back to where the victim was sitting. Appellant said, "I'm almost out the [front] door, but I -- I dropped something.

3

I picked it up and I was like, man, forget this, man. I can't go -- keep going and letting my mother go through this. . . . That was the boiling point. . . . And I snapped." Appellant claimed that he turned around, closed his eyes, and squeezed the trigger, shooting the victim four times in the back of the head. Appellant said that he and the victim did not exchange any words, explaining, "I just walked out and shot him." Appellant also talked about the disputes that he had with the victim in the months leading up to the shooting and again claimed that he had just "snapped" after seeing the furniture missing and the victim laughing.

At trial, the detective who questioned Appellant on the night of the killing testified that Appellant kept bringing up the past disputes with the victim during the interview, but there was "never an indication of any kind of physical or sexual assaults" against Appellant. Appellant told the detective that he believed that the victim was taking advantage of his mother financially and using her while he remained unemployed. Appellant also told the detective about a fire in the duplex that originated from a bag of the victim's work clothes left sitting on a heater grate. Appellant claimed that the victim started the fire to kill his mother, but Ms. Johnson told police at the time of the fire that she believed

4

Appellant set it. She told police that on the night before the fire, Appellant and the victim had gotten into an argument, and she then overheard Appellant tell someone on the phone that he was "going to murk [the victim] for disrespecting [him]," which she understood to be slang for murder. At trial, however, Ms. Johnson testified that she now believed that the victim may have started the fire. Ms. Johnson also discussed an incident a few days before the killing when the victim flipped over a table because she said she was moving out. However, Ms. Johnson testified that the victim had never harmed her and was a nice man. Ms. Johnson explained that she had told Appellant that the furniture was going to be removed on the day of the shooting. Appellant was not present during the table-flipping incident and never mentioned it in his multiple interviews with mental health experts.

Five experts testified at trial about Appellant's mental capacity at the time of the shooting. Appellant called a psychologist and a psychiatrist who had treated him at Georgia Regional Hospital while he was awaiting trial. They both testified that he experienced delusions that were not overtly bizarre and that lasted for at least a month and that they therefore diagnosed him with a delusional disorder of the persecutory type that focused on the victim.

Appellant's third expert, a forensic psychologist, testified that Appellant had a delusional disorder and was suffering from a delusional compulsion at the time of the shooting. In rebuttal, the State called forensic psychologist Amy Leeper, who testified that there was not enough evidence to diagnose Appellant with any mental illness, that there was no evidence he was operating from a delusional compulsion at the time of the shooting, and that his behavior instead seemed to be motivated by anger and frustration. Forensic psychologist Phillip Barron, who had been appointed by the trial court to conduct an evaluation of Appellant, see OCGA § 17-7-130.1, concurred with Dr. Leeper's opinion that there was insufficient evidence for a diagnosis of delusional disorder. Dr. Barron concluded that Appellant appeared to be motivated by anger and frustration and animosity toward his stepfather, rather than being motivated by a psychotic mental illness. All five experts agreed that Appellant was logical, coherent, goal-directed, and oriented as to time and place when they interviewed him. Appellant did not testify at trial.

Appellant does not challenge the legal sufficiency of the evidence supporting his convictions. Nevertheless, as is this Court's practice in murder cases, we have reviewed the record and conclude that, when viewed in the light

6

most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes for which he was convicted.  See Jackson v. Virginia, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979).  See also Vega v. State, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).

2.     Appellant's sole contention is that the trial court erred in denying his written request to charge the jury on voluntary manslaughter.  "When instructing the jury in a murder case, a trial court is required to grant the defendant's request for a charge on the lesser included offense of voluntary manslaughter if there is any evidence, however slight, to support such a charge. Whether such slight evidence exists is a question of law."  Blake v. State, 292 Ga. 516, 518 (739 SE2d 319) (2013) (citation omitted).  The trial court here ruled that there was no evidence to support a voluntary manslaughter charge, and we agree.

"A charge on voluntary manslaughter must be supported by evidence that the defendant 'act[ed] solely as the result of a sudden, violent, and irresistible

7

passion resulting from serious provocation sufficient to excite such passion in a reasonable person.'" Humphrey v. Lewis, 291 Ga. 202, 211 (728 SE2d 603) (2012) (quoting OCGA § 16-5-2 (a)). The voluntary manslaughter statute establishes an objective standard; "[t]he provocation required to mitigate malice is that which would arouse a heat of passion in a *reasonable* person," Hall v. Lewis, 286 Ga. 767, 774 (692 SE2d 580) (2010) (emphasis in original), and "[i]t is of no moment whether the provocation was sufficient to excite the deadly passion in the particular defendant," Lewandowski v. State, 267 Ga. 831, 832 (483 SE2d 582) (1997). Thus, we must evaluate the alleged provocation evidence with respect to its effect on a reasonable person, putting aside any peculiar response Appellant may have had. See Partridge v. State, 256 Ga. 602, 603 (351 SE2d 635) (1987) (rejecting the argument by the defendant, who was found guilty but mentally ill of murder, that "his fragile mental state" should be considered, "[i]n light of the fact that the legislature has prescribed an objective standard for determining when a defendant is entitled to a charge on voluntary manslaughter"). See also Lewandowski, 267 Ga. at 832 (holding that psychological evidence regarding the effect of the victim's conduct on the defendant's mental state at time of the killing was properly excluded as

irrelevant to a voluntary manslaughter defense).[2]

Appellant argues that he was provoked to kill his step-father due to passion – anger and frustration – caused by his antagonistic relationship with the victim, the family's financial problems, and the victim's laughter when Appellant arrived home on the evening of the shooting. But this Court has consistently held that, as a matter of law, these sorts of provocations are not sufficiently serious to provoke a "sudden, violent, and irresistible passion" that would compel a reasonable person to kill. Thus, the evidence of Appellant's generally antagonistic relationship with the victim, even to the extent it involved physical confrontations, did not require a voluntary manslaughter charge. See, e.g., Francis v. State, 296 Ga. 190, 193 (766 SE2d 52) (2014) ("'Though there was evidence of ongoing marital difficulties between [Francis] and [his wife]

---

[2] Pointing to the expert testimony opining that Appellant was subjectively motivated to kill the victim out of anger, frustration, and animosity, Appellant asserts that under Morgan v. State, 290 Ga. 788 (725 SE2d 255) (2012), he was entitled to a voluntary manslaughter charge. In Morgan, our summary of the evidence presented at trial mentioned that the defendant's "therapist offered his opinion that [the defendant] did not intend to kill the victim but instead acted out of rage," and we later noted in passing that the defendant "requested a pattern charge on voluntary manslaughter, which was at least slightly supported by the evidence" (and which the trial court gave, so there was no issue presented regarding whether such a charge should have been given). Id. at 790. We did not hold or even suggest that this psychological evidence about the defendant was evidence of serious provocation; this evidence was cited only as it related to the defendant's subjective intent to kill. In any event, giving such a charge based solely on evidence of the defendant's subjective mental condition would have been inconsistent with cases like Partridge. Thus, Morgan provides no support for Appellant's claim.

and past acts of violence committed by [his wife] against [Francis], there was no evidence of any specific provocation at or around the time of the murders such as would generate the 'sudden . . . and irresistible passion' necessary to support a conviction for voluntary manslaughter.'" (citation omitted)); Demons v. State, 277 Ga. 724, 725 (595 SE2d 76) (2004) ("Testimony regarding discord in the relationship between [the defendant] and the victim does not constitute evidence of provocation or passion.").

This is especially so given the lengthy interval between the past altercations and the killing. See Smith v. State, 296 Ga. 731, 737-738 (770 SE2d 610) (2015) (holding that "the evidence in this case does not rise to a level sufficient to support a voluntary manslaughter charge," when "the evidence shows that the prior altercation and fighting involving appellant's relatives occurred some 30 or 40 minutes before the appellant arrived at the apartment complex" where the victim was shot); Jones v. State, 296 Ga. 663, 666 (769 SE2d 901) (2015) (holding that "the trial court [could] determine, as a matter of law, that the one-day interval between that possible provocation and the killings was 'sufficient for the voice of reason and humanity to be heard' by Appellant, so that 'the killing[s] shall be attributed to deliberate revenge and be punished

as murder,' OCGA § 16-5-2 (a)," and citing similar holdings where the interval was only "a few hours" and "three to four hours").

Likewise, arguments over money are not serious provocations requiring a voluntary manslaughter charge, nor in general are any words alone sufficient. See Gresham v. State, 289 Ga. 103, 104 (709 SE2d 780) (2011) (holding that no voluntary manslaughter charge was required based on an argument over money). See also Merritt v. State, 292 Ga. 327, 331 (737 SE2d 673) (2013) ("As a matter of law, angry statements alone ordinarily do not amount to 'serious provocation' within the meaning of OCGA § 16-5-2 (a)."). Finally, even assuming that the victim was laughing at Appellant and not at the television, laughter does not constitute serious provocation. See Mack v. State, 272 Ga. 415, 417 (529 SE2d 132) (2000) (holding that no voluntary manslaughter charge was required where "the victim called [the defendant] names, cursed him, laughed at him, and derided his physique").

In Pace v. State, 258 Ga. 225 (367 SE2d 803) (1988), the defendant killed his brother and was found guilty but mentally ill of murder. See id. at 225. In support of his request for a voluntary manslaughter charge, he pointed to the following statement he had made:

11

"[The victim] said that [the lights] were going to be cut off tomorrow. [The victim] said that we weren't helping him pay the bills. . . . That made me mad and I jumped up. We started passing a few words. I had a lot of pressure on me and I just popped. I had on some paratrooper pants and I had my gun in my right pocket. The gun is a .25 automatic. . . . I pulled the gun out and started shooting him. I think I shot him 6 times."

Id. at 225-226. This Court held "as a matter of law that these facts do not present the necessary evidence of sufficient provocation to excite the passions of a reasonable person which would have entitled the defendant to a charge on voluntary manslaughter." Id. at 226. It follows that there was no evidence of serious provocation in this case, where Appellant's anger was not triggered by an immediate argument and instead of just pulling out a gun and shooting, he had to go to his bedroom to get his gun, unlock the hammer, load the gun, and return with it to the living room, where he shot the unarmed, television-watching victim four times in the back of head without exchanging a word.

It is undisputed that, while [the victim] was in [Appellant's] presence on [the day of the killing], [the victim] did not use threatening words, make aggressive movements, or pull a weapon. Under these circumstances, [Appellant's] response to the provoking incident was objectively unreasonable, and nothing in the evidence required a charge on voluntary manslaughter.

Johnson v. State, 292 Ga. 785, 787 (741 SE2d 627) (2013). Thus, the trial court

12

did not err in denying Appellant's request for a jury charge on voluntary manslaughter.

Judgment affirmed.  All the Justices concur.