301 Ga. 14
FINAL COPY

S17A0352.  SHAW v. THE STATE.

NAHMIAS, Justice.

Appellant Antonio Shaw was convicted of the malice murder of Shomari Grier, criminal attempt to commit the murder of Ashley McCord, aggravated assault of Lashaun Brown, and three counts of possession of a firearm during the commission of a felony.[1]  Appellant contends that the trial court erred in excluding evidence of a witness's alleged gang affiliation and in not instructing the jury on voluntary manslaughter as a lesser included offense of murder.  We affirm.

1.     Viewed in the light most favorable to the verdicts, the evidence at

---

[1] The crimes occurred on December 10, 2011.  On September 18, 2012, a Fulton County grand jury indicted Appellant for malice murder, felony murder, criminal attempt to commit murder, three counts of aggravated assault with a deadly weapon, and three counts of possession of a firearm during the commission of a felony.  The case went to trial on December 10, 2012, and on December 13, the jury found Appellant guilty on all counts.  On December 20, the trial court sentenced him to serve life in prison for malice murder, 20 consecutive years for criminal attempt to commit murder, 20 concurrent years for aggravated assault, and five years for each firearm possession count to run consecutive to the life sentence but concurrent to each other.  The remaining counts merged or were vacated by operation of law.  Appellant filed a timely motion for new trial, which he amended with new counsel on August 31, 2015.  The trial court denied the motion on April 15, 2016.  Appellant filed a timely notice of appeal, and the case was docketed in this Court for the term beginning in December 2016 and orally argued on February 7, 2017.

trial showed the following. Ashley McCord was in an off-and-on relationship with Shelicia Reese, and on the night of December 9-10, 2011, McCord spent the night at Reese's apartment in Atlanta. In the morning, McCord returned home to her girlfriend, Denee Simpson. Simpson caught McCord trying to sneak into the house and told her to go back to where she had spent the night. McCord began driving back to Reese's apartment, calling Reese on the way. The two women started arguing about their relationship, and Reese surreptitiously added Simpson to the call, allowing her to listen in. As McCord drove, she picked up her friend Shomari Grier, who wanted a ride to the mall.

When McCord and Grier arrived at Reese's apartment, Reese refused to open the door. Reese told McCord that she was on the phone with Reese's mother, so McCord better not hurt her. When McCord promised that she was not there to fight, Reese opened the door and went upstairs to her bedroom. McCord followed Reese while Grier remained downstairs. Upstairs, Reese dropped her phone and McCord realized that Reese's call was with Simpson, not Reese's mother. Reese and McCord began to argue and scuffle on the bed.

Reese then grabbed her phone and called Lashaun Brown, a friend and

co-worker who had planned to go to the library with Reese that day. Reese asked Brown to come over now and help get McCord, who weighed about 230 pounds, off of her. Appellant, who also worked with Brown and Reese, then drove Brown and her baby to Reese's apartment.[2] Appellant had a handgun in his car.

When Appellant and Brown arrived at Reese's apartment, Brown called three times for Reese to let them in the door. During the final call, Brown told Reese that Appellant was with her, and Reese asked for Appellant to help get McCord out of the apartment. Reese then ran downstairs to let in Brown and Appellant. McCord walked downstairs and prepared to leave with Grier. When McCord and Grier approached Reese, Brown, and Appellant, who was standing by the front door, Brown asked McCord why she was beating up Reese. McCord started to leave, but Brown persisted in asking McCord why she was hurting Brown's friend. McCord replied that she did not want to fight, especially while Brown was holding her baby. Grier then whispered to McCord

---

[2] Appellant and Brown both testified that they were no more than friends, although text message records indicated they told one another "I love you" and Brown also testified that Appellant was her "partner."

that Appellant had a gun tucked into his waistband, and McCord saw it sticking out. No one else had a gun.

When McCord and Grier moved to leave the apartment, Brown handed her baby to Reese and then punched McCord in the side of her head. McCord and Brown scuffled out the door onto the front porch. No more punches were thrown, and McCord did not hurt Brown; McCord just put her weight on Brown. Reese stayed inside the doorway with Brown's baby but poked her head out to watch what was happening. Appellant and Grier stood on the front steps, also watching the fight. Appellant moved to intervene, and McCord heard him say, "I'm fixing to blow that b***h's brains out." Grier told Appellant not to get involved because it was only girls fighting and it was "one-on-one."

Reese then saw Appellant pull out a gun and shoot Grier. Reese jumped back and shut the door, but watched through a window as Grier grabbed his arm and ran down the street. Appellant continued to fire shots at Grier until Grier collapsed in the street a short distance away. Appellant then turned toward the tussling women and shot at McCord. McCord begged Appellant not

4

to kill her, but after pausing to listen to her plea, he continued to shoot, hitting her a total of four times. Brown jumped up, then realized that she had been hit twice by bullets that passed through McCord. She shouted at Appellant, "Bro, you shot me!"

Grier died on the street. Forensic evidence showed that he had been shot four times from a distance of at least three feet. The fatal shot passed through his heart and lung; the other three shots struck his arms. Appellant helped Brown to his car and drove her to Grady Memorial Hospital. McCord lay on the ground until Brown left, calling for Grier, then crawled to her vehicle and drove to another hospital. A neighbor called the police after hearing the gunshots.

Using Appellant's phone, Brown called Reese from the hospital and asked Reese to bring her baby to Grady. Reese then called Eric Evans, her boyfriend and Appellant's brother-in-law, and said, "[Appellant] just shot these people over here." Evans picked up Reese and drove her and Brown's baby to Grady. At the hospital, Brown told Evans that she had been shot in a drive-by shooting. As Reese and Evans were leaving, Appellant, who had been briefly

5

detained by police at the hospital but then released, told Reese that he would follow them to the house of Reese's sister, Sequanna Holmes, where Evans was dropping off Reese.

When they arrived, Holmes met them and asked what had happened. Appellant, who appeared "shaken up" and "nervous," said that he had "unloaded" on Grier and McCord, shooting about 19 times. Appellant said that he had been shot at before and felt that it was "him or the man," so he was not going to take any chances when he saw Grier's hand reaching for something under Grier's shirt. Appellant showed them a 9mm gun hidden in the back seat of his car underneath the baby seat. He explained that he had distracted the police when they searched his car at the hospital by opening his trunk, so they never searched around the baby seat. Appellant also told Holmes, Evans, and Reese that he washed his hands inside the hospital so they would not contain gunshot residue, although the police then did not test his hands. Later, Appellant told Brown that his uncle helped him to dispose of the gun.

Meanwhile, McCord picked out Appellant in a photographic lineup shown to her in the hospital, and she identified him as the shooter then and at

6

trial. At Reese's apartment, investigators recovered two metal bullet jackets, several metal jacket fragments, and nine 9mm shell casings, all near the porch and walkway, with one casing just inside the apartment door. A 9mm bullet was removed from Grier's body. Ballistics analysis revealed that the bullet, metal jackets, and two of the metal jacket fragments all were fired from the same gun. The shell casings were also all fired from the same gun, although there was no way to determine whether the gun that fired the casings was the same gun that fired the bullet, metal jackets, and fragments.

At trial, Appellant testified as follows. He drove Brown and her baby to Reese's apartment, where he got out of the car and handed the baby to Reese at the front door while Brown got her baby bags out of the back seat. He then drove away while Brown was on the front steps with her bags and Reese was inside with the baby. A few minutes later, Appellant called Brown to ask when she wanted to be picked up, but Reese answered the phone saying that Brown had been shot. Appellant returned to the apartment and saw Brown sitting on the front steps, so he helped her into his car and drove to Grady. After allowing the police to search his car at the hospital, he drove home. Appellant

7

claimed that he saw no one other than Reese and Brown at Reese's apartment.

When Reese and Brown first spoke to the police, their stories tracked Appellant's account, including never mentioning McCord or Grier. Reese initially said that a black car with tinted windows drove by her apartment and shot at Brown out of a cracked window. Reese was indicted with Appellant, but she negotiated a plea agreement under which she agreed to plead guilty to one count of aggravated assault and one count of making a false statement and to testify truthfully at Appellant's trial in exchange for the dismissal of the other charges.[3] Reese testified that Appellant was the shooter, explaining that she had initially lied because Appellant and Brown warned her to tell the police the drive-by story or Appellant would "do something" to her.

Brown initially told the police and others that she was shot in a drive-by shooting. She later signed an affidavit for the police saying that she was shot from behind by McCord and McCord's brothers and that the brothers had warned her not to testify. Later, during a meeting with the prosecutor and his investigator, Brown was informed that making a false statement was a crime.

---

[3] At Reese's later plea hearing, the trial court dismissed the aggravated assault charge based on insufficient evidence.

Brown ultimately testified that Appellant shot Grier and then her and McCord during the fight between her and McCord.

Appellant does not challenge the legal sufficiency of the evidence supporting his convictions. Nevertheless, in accordance with this Court's practice in murder cases, we have reviewed the record, and we conclude that the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes for which he was convicted. See Jackson v. Virginia, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also Vega v. State, 285 Ga. 32, 33 (1) (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).

2. Appellant contends that the trial court violated his constitutional right to confront the witnesses against him by refusing to allow him to cross-examine witnesses about McCord's alleged gang affiliation. The main defense theory at trial was that the victims were shot in a drive-by shooting, as Reese and Brown had claimed in their initial accounts to the police. On cross-

examination by Appellant, Brown testified that she was scared of McCord and had been threatened by McCord's brothers, and Reese testified that McCord frequently carried guns. Appellant also proffered evidence to the trial court indicating that McCord belonged to a gang and that a group of her female friends broke into Holmes's house with baseball bats on the night of the shooting. Appellant contended that this evidence as a whole would show that the shooting was gang-related, because gangs engage in drive-by shootings, and that McCord, as a gang member, was motivated to cover that up.

"[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Delaware v. Fensterer, 474 U. S. 15, 20 (II) (106 SCt 292, 88 LE2d 15) (1985) (emphasis in original). Limitations on cross-examination are generally reasonable "'so long as the court does not cut off all inquiry on a subject that the defense is entitled to cross-examine on.'" Nwakanma v. State, 296 Ga. 493, 501 (6) (768 SE2d 503) (2015) (citation omitted). "As we have repeatedly explained, trial courts retain wide latitude to impose reasonable limits on cross-examination 'based on

concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" Id. (citation omitted). See also Johnson v. State, 270 Ga. 234, 234-235 (507 SE2d 737) (1998) (affirming a trial court's restriction on gang-related cross-examination). In this case, the trial court allowed the jury to hear the evidence of McCord's firearm possession, Brown's fear of her, and McCord's brothers' threats toward Brown in support of Appellant's claims that McCord was biased and had sought to influence the State's other witnesses. However, the trial court ruled that Appellant had failed to show that McCord's alleged gang affiliation was related to the shooting or the claims of witness bias and intimidation.

We see no abuse of discretion in the trial court's evidentiary ruling. See Nicely v. State, 291 Ga. 788, 796 (4) (733 SE2d 715) (2012) ("The permissible scope of cross-examination is committed to the sound discretion of the trial court, and we review a limitation of the scope of cross-examination only for abuse of discretion."). No evidence was proffered as to who committed the purported drive-by shooting; whether it was supposedly aimed at McCord or

someone else present (none of whom was alleged to have a gang affiliation); or why McCord would seek to blame the shooting on Appellant (as to whom there also was no allegation of gang affiliation). Nor was there any evidence that McCord's brothers or female friends were members of a gang. In addition, as the State noted, the evidence of McCord's alleged gang affiliation would be highly prejudicial. See Lingo v. State, 329 Ga. App. 528, 532 (765 SE2d 696) (2014) (physical precedent only). Furthermore, given the strength of the other evidence against Appellant, including the forensic evidence corroborating the State's witnesses and undermining Appellant's drive-by theory, we could not say that the exclusion of the gang affiliation evidence was harmful. See Delaware v. Van Arsdall, 475 U. S. 673, 684 (106 SCt 1431, 89 LE2d 674) (1986).

3. Appellant also claims that the trial court erred in refusing his request to instruct the jury on voluntary manslaughter. "'When instructing the jury in a murder case, a trial court is required to grant the defendant's request for a charge on the lesser included offense of voluntary manslaughter if there is any evidence, however slight, to support such a charge. Whether such slight

evidence exists is a question of law.'" Johnson v. State, 297 Ga. 839, 842 (2)

(778 SE2d 769) (2015) (citation omitted).

> "A charge on voluntary manslaughter must be supported by evidence that the defendant 'act[ed] solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person.'" Humphrey v. Lewis, 291 Ga. 202, 211 (728 SE2d 603) (2012) (quoting OCGA § 16-5-2 (a)).

Johnson, 297 Ga. at 842 (2).[4]

There was no evidence that Appellant shot and killed Grier solely as the

result of a sudden, violent, and irresistible passion. There arguably was slight

evidence that Appellant had feared for his life, as Evans and Holmes testified

that Appellant said that he saw Grier reach for something under Grier's shirt

and he thought that it was "him or the man." That might be enough for a self-

defense charge, which the trial court gave, but not a voluntary manslaughter

charge.

---

[4] Although Appellant's "drive-by shooting" theory and his own testimony that he was not even present during the shooting directly contradicted any claim that he committed voluntary manslaughter, he was not precluded from seeking such a charge based on other evidence presented to the jury. See Raines v. State, 247 Ga. 504, 506 (1) (277 SE2d 47) (1981) ("'Although the appellant's testimony may have excluded voluntary manslaughter as a possible verdict, the evidence as a whole did not.'" (citation omitted)). See also Mathews v. United States, 485 U. S. 58, 63-64 (108 SCt 883, 99 LE2d 54) (1988) (A defendant has the right to present inconsistent defenses.).

> The provocation necessary to support a charge of voluntary manslaughter is markedly different from that which will support a self-defense claim. The distinguishing characteristic between the two claims is whether the accused was so influenced and excited that he reacted passionately rather than simply in an attempt to defend himself. Only where this [passion] is shown will a charge on voluntary manslaughter be warranted.

Pulley v. State, 291 Ga. 330, 334-335 (4) (729 SE2d 338) (2012) (citation and punctuation omitted).

Nothing Grier did or said would provoke the requisite passion in a reasonable person. See Pulley, 291 Ga. at 335 (4) ("'This Court has repeatedly held that neither fear that someone is going to pull a (weapon) nor fighting prior to a homicide are types of provocation demanding a voluntary manslaughter charge.'" (citation omitted)); Merritt v. State, 292 Ga. 327, 331 (2) (737 SE2d 673) (2013) ("'To put it simply, words alone (generally) are not sufficient provocation to excite the passion necessary to give rise to voluntary manslaughter.'" (citation omitted)). Additionally, Appellant's "shaken up" or "nervous" demeanor when talking to Reese, Holmes, and Evans more than an hour after the shooting was not evidence that he was experiencing a sudden, violent, and irresistible passion at the time of the shooting. Finally, any alleged

14

provocation arising from McCord's tussle with Appellant's associate Brown would not explain why Appellant repeatedly shot at and killed Grier, continuing to fire as Grier ran away from the women. There was no evidence that Appellant shot Grier in a misdirected effort to shoot McCord, and Appellant's subsequent shooting of McCord was not a homicide to which a voluntary manslaughter charge could apply. None of the voluntary manslaughter cases cited by Appellant holds that such a charge is required when a defendant allegedly provoked by one person aimed at and killed a different person. Accordingly, the trial court did not err in declining to give a voluntary manslaughter instruction.

Judgment affirmed. All the Justices concur.

Decided April 17, 2017.

Murder. Fulton Superior Court. Before Judge Baxter.

Michael W. Tarleton, for appellant.

Paul L. Howard, Jr., District Attorney, Paige Reese Whitaker, Lyndsey H. Rudder, Kevin C. Armstrong, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General,

Paula K. Smith, Senior Assistant Attorney General, Jason M. Rea, Assistant

Attorney General, for appellee.