306 Ga. 464
FINAL COPY

S19A0809.  COLLINS v. THE STATE.

NAHMIAS, Presiding Justice.

Appellant Casey Collins was convicted of malice murder and other crimes in connection with the strangling death of his 78-year-old grandfather, Edward Ronald Smith. On appeal, he contends that his trial counsel provided ineffective assistance by failing to investigate and present evidence that he was sexually abused by Smith and by failing to withdraw as counsel after Appellant filed a bar complaint alleging ethical violations. We conclude that these contentions are meritless, so we affirm.[1]

---

[1] The crimes occurred on May 2, 2013. A Cobb County grand jury later indicted Appellant for malice murder, felony murder, four counts of armed robbery, two counts of aggravated assault (one by strangling with a belt, and the other by stabbing with a knife), and one count of concealing the death of another. Appellant was tried from April 20 to 23, 2015, and the jury found him guilty on all counts. The trial court sentenced him to serve life in prison without the possibility of parole for malice murder; a consecutive term of life for armed robbery; a concurrent term of 20 years for the aggravated assault with a knife; and a consecutive term of 10 years for concealing the death. The remaining counts were vacated or merged. Appellant filed a motion for new trial on May 1, 2015, which he amended several times with new counsel. After

1. Viewed in the light most favorable to the jury's verdicts, the evidence presented at trial showed the following. Smith was a drug dealer who ran a prescription pill scheme. As part of the scheme, he would take Appellant and other family members to different doctors to obtain prescriptions for pain medicine. Smith would then give the family member half of the prescribed pills and keep the remaining half to sell. Appellant and his girlfriend, Sarah Cook, were addicted to opiates and would often dissolve the pills in water and inject the resulting solution. They also bought pills from Smith almost daily for about $20 per pill, and Smith would occasionally "front" them pills when they did not have enough money. Appellant and Cook lived together in her grandmother's house on Kemolay Road in Mableton.

On May 2, 2013, the couple woke up "dope sick," experiencing withdrawal symptoms and in need of another pill. They called Smith

hearings on January 8, February 12, and March 4, 2016, the trial court denied the motion on January 27, 2017. Appellant filed a timely notice of appeal, which he amended several times. After this Court received the record, the case was docketed here for the April 2019 term and was orally argued on June 19, 2019.

to ask for more pills. When he arrived at the house, he refused to front Cook any pills because she already owed him about $700. Cook then took her grandmother's bank card, and Smith drove Appellant and Cook to an ATM, but the bank account was empty. When they returned home, the couple begged Smith to front them some pills. He refused, which made them angry. Appellant and Cook went inside while Smith waited in his pickup truck in the carport. Appellant told Cook to ask Smith one more time to front them pills; if Smith refused, they would rob him. Appellant gave Cook a pocketknife and told her that he "had [her] back" and that "I want to f**king kill him." Cook understood that Appellant would give her a signal and then she was to start stabbing Smith.

When they walked outside, Smith was still sitting in the driver's seat of his truck. Cook got in the passenger's seat, and Appellant stood beside the open driver's side door. Cook again asked Smith to front them some pills, and Smith again refused. Cook looked at Appellant, who gave her a nod; she then began stabbing Smith in the chest with the pocketknife. Smith tried to defend

3

himself, but Appellant took his belt off, wrapped it around Smith's neck, and twisted the belt as he pulled it tight, strangling Smith for two to four minutes until Smith died. Appellant then took Smith's wallet and pills, shoved his body behind the truck's seats, and covered it with the built-in tarp.

Appellant and Cook drove the truck around town for the rest of the day, injecting dissolved pills and spending about $1,000 that they found in Smith's wallet at two gas stations, a Walmart, two Targets, and a GameStop. Around 8:20 p.m., the couple abandoned the truck in a condominium complex, with Smith's body still inside under the tarp, and took a taxi back to Kemolay Road.

A few days later, Appellant's mother and aunt reported Smith missing to the Cobb County Police Department. Detectives learned that Smith's truck had been viewed by a license-plate reader at a Walmart at 1:51 p.m. on May 2; they then obtained photos from Walmart's surveillance-video system showing Appellant and Cook getting out of the truck. The detectives went to speak with the couple at the Kemolay Road house, but both Appellant and Cook denied

4

knowing where Smith was. Appellant claimed that Smith had taken them to a different Walmart to run some errands on the morning of May 2, and that Smith had dropped them back off at home around 10:30 or 11:00 a.m. and was headed toward his girlfriend's house. The detectives asked Appellant and Cook to come to the police station to give separate formal statements, which the couple agreed to do.

At the station, the detectives confronted Appellant with the surveillance photos, and he changed his story several times, but he still denied any knowledge of Smith's whereabouts. After the interview ended, Appellant was arrested. The detectives then found receipts in Appellant's wallet from several of the stores that he and Cook visited after killing Smith. Cook initially told the same cover story — that she and Appellant ran errands with Smith on the morning of May 2 before he left around 11:00 a.m. to go to his girlfriend's house — after which she was also arrested. A few hours later, she confessed, and she told the detectives where to find Smith's truck and body. The detectives found Smith's body in the

truck; a medical examiner determined that he had died of manual strangulation with a ligature such as a belt. He also had been stabbed four times in the chest, but those wounds would not have been fatal. Store receipts and surveillance video from several of the places Appellant and Cook visited after killing Smith corroborated her account. Cook later pled guilty to aggravated assault and armed robbery and testified against Appellant at his trial. Appellant did not testify; his primary theory of defense was that he only intended to rob Smith, that Cook was lying, and that she, not Appellant, killed Smith.

Appellant does not dispute the legal sufficiency of the evidence supporting his convictions. Nevertheless, as is this Court's practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also *Vega v.*

6

*State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).

2. Appellant contends that his trial counsel provided constitutionally ineffective assistance by failing to investigate and present evidence that Smith had sexually abused Appellant over the course of several years when he was a small child, causing him to suffer from post-traumatic stress disorder (PTSD). Appellant argues that such evidence would have entitled him to a jury instruction on the lesser offense of voluntary manslaughter. In order to prevail on this claim, Appellant must prove that his trial counsel's performance was professionally deficient and that he was prejudiced as a result. See *Strickland v. Washington*, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). To establish deficient performance, Appellant must show that counsel "performed his duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms." *Davis v. State*, 299 Ga. 180, 182-183 (787 SE2d 221) (2016). To establish prejudice, Appellant must

7

show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In reviewing Appellant's claim, we accept the trial court's findings of fact unless they are clearly erroneous, but we apply the law to the facts de novo. See *Barrett v. State*, 292 Ga. 160, 167 (733 SE2d 304) (2012). When we apply these principles, it is clear that Appellant's claim is meritless.

A person commits the offense of voluntary manslaughter when he kills the victim "under circumstances which would otherwise be murder" but "acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite the passion in a reasonable person[.]" OCGA § 16-5-2 (a). "'[T]he provocation required to mitigate malice is that which would arouse a heat of passion in a *reasonable* person'; whether the provocation was sufficient to provoke deadly passion in the particular defendant is irrelevant." *Prothro v. State*, 302 Ga. 769, 773 (809 SE2d 787) (2018) (quoting *Johnson v. State*, 297 Ga. 839, 842 (778 SE2d 769) (2015) (emphasis in original)).

Accordingly, this Court has consistently held that evidence of a defendant's subjective mental condition or mental illness is not relevant to a claim of voluntary manslaughter. See, e.g., *Lewandowski v. State*, 267 Ga. 831, 832 (483 SE2d 582) (1997) (holding that a psychologist's expert testimony about the defendant's mental state was properly excluded as irrelevant to his claim of voluntary manslaughter); *Partridge v. State*, 256 Ga. 602, 603-604 (351 SE2d 635) (1987) (rejecting the defendant's argument that "his fragile mental state" should be considered because "the legislature has prescribed an objective standard for determining when a defendant is entitled to a charge on voluntary manslaughter"). See also *Huff v. State*, 292 Ga. 535, 536-537 (739 SE2d 360) (2013). In light of these precedents, efforts to investigate Appellant's sexual abuse allegations in order to present evidence of his alleged PTSD in the hope of obtaining a jury instruction on voluntary manslaughter would have been a waste of time, and trial counsel's failure to do so was therefore neither deficient nor prejudicial. See *Prothro*, 302 Ga. at 773. See also *Cochran v. State*,

9

305 Ga. 827, 832 (828 SE2d 338) (2019).[2]

Moreover, even if such evidence were somehow admissible, Appellant cannot establish that he was prejudiced by any failure of his trial counsel to investigate, because he has not presented any persuasive evidence that he actually suffers from PTSD that affected him at the time he killed Smith. At the motion for new trial hearing, Appellant called forensic psychologist Dr. Kevin Richards, who testified that — based solely on what Appellant had told him during a brief pre-trial evaluation — he believed that Appellant suffered from PTSD and that Appellant likely experienced some loss of control during the attack on Smith. On cross-examination, however, Dr. Richards learned that Appellant had lied about how the killing occurred, had omitted mention of his participation in Smith's prescription drug scheme and of the drug binge and shopping spree following Smith's death, and had told his brother that he had "gotten over" the abuse several years before. Dr.

---

[2] Such evidence of Appellant's allegedly diminished mental condition also would have been inadmissible to negate his criminal intent. See, e.g., *Virger v. State*, 305 Ga. 281, 302-303 (824 SE2d 346) (2019).

10

Richards then testified that his diagnosis likely would have been different had he known about that information, and the information possibly would have prevented him from testifying in Appellant's defense at all. Appellant asserts in his brief here that his past psychologists and counselors, current counselor, and family members could have supported his allegations of sexual abuse and resulting PTSD, but assertions are not evidence. See, e.g., *Mangrum v. State*, 291 Ga. 529, 530 (731 SE2d 761) (2012) (holding that a showing of prejudice from an alleged deficiency in procuring and offering medical evidence requires more than mere speculation that medical records and testimony would have bolstered the defense at trial).

In addition, Appellant has cited no case in which provocation by the homicide victim years before the killing — even provocation as terrible as child sexual abuse — was held to support a claim of voluntary manslaughter. See OCGA § 16-5-2 (a) ("[I]f there should have been an interval between the provocation and the killing sufficient for the voice of reason and humanity to be heard, . . . the

killing shall be attributed to deliberate revenge and be punished as murder."); *Johnson*, 297 Ga. at 843-844 (citing cases holding that an interval of "one day," "a few hours," or even "30 or 40 minutes" was sufficient as a matter of law to defeat a claim of voluntary manslaughter). Accordingly, Appellant has not shown that his trial counsel's alleged shortcomings had any reasonable probability of affecting the outcome of his trial.

3. Finally, Appellant contends that his trial counsel provided ineffective assistance by failing to withdraw from representing him before trial. We disagree.

In the month before his trial, Appellant sent a letter to the State Bar to complain about his trial counsel, alleging ethical violations including improper discussions with Appellant's mother about whether Appellant should have taken a plea deal and other information and failing to give Appellant all of the discovery. The letter ended by saying, "My goal in this matter is to request [trial counsel] be asked or made to withdraw himself as my counsel, and to be appointed counsel who will represent me to the fullest." At the

motion for new trial hearing, trial counsel testified that when the bar sent him a copy of the letter, he responded with a letter to Appellant explaining why Appellant's accusations were unfounded and then visited Appellant to resolve the matter in person. Counsel testified that he viewed the incident as a "blip" in their otherwise amicable relationship. During a pre-trial motions hearing a few days before trial, the court had addressed similar complaints by Appellant about access to discovery, asking, "Are you happy with the services that [counsel] is providing you?" Appellant answered, "Very much[.]"

Appellant now argues that upon receipt of the bar complaint, his trial counsel should have immediately withdrawn from representation, relying on a comment to Rule 1.16 of the Georgia Rules of Professional Conduct relating to a lawyer's obligation to decline or withdraw from representation where the client insists that the lawyer engage in illegal or unethical conduct.[3] Appellant

---

[3] Appellant cites Comment 2 to Rule 1.16, which says:
A lawyer ordinarily must decline or withdraw from representation

13

does not identify, however, any illegal or unethical conduct in which he supposedly demanded his trial counsel engage.

Moreover, although Appellant cites the *Strickland* deficiency-and-prejudice test applicable to most claims of ineffective assistance of counsel, "[i]n order for a criminal defendant to prevail on a claim that his attorney was ineffective due to a conflict of interest, he must show that an actual conflict of interest adversely affected his lawyer's performance." *Holsey v. State*, 291 Ga. App. 216, 221 (661 SE2d 621) (2008) (citation and punctuation omitted). See also *Tanner v. State*, 303 Ga. 203, 207 (811 SE2d 316) (2018) ("An 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance," not just "a mere theoretical division of loyalties." (quoting *Mickens v. Taylor*, 535 U.S. 162, 171, 172 n.5 (122 SCt 1237, 152 LE2d 291) (2002)). A bar complaint,

if the client demands that the lawyer engage in conduct that is illegal or violates the Georgia Rules of Professional Conduct or other law. The lawyer is not obliged to decline or withdraw simply because the client suggests such a course of conduct; a client may make such a suggestion in the hope that a lawyer will not be constrained by a professional obligation.

14

standing alone, does not require immediate withdrawal or disqualify trial counsel in a criminal case. See *Holsey*, 291 Ga. App. at 221. See also *Robinson v. State*, 312 Ga. App. 736, 752-754 (719 SE2d 601) (2011) (holding that the defendant's filing of a pro se lawsuit against his counsel before trial based on purported deficiencies did not automatically establish a conflict of interest requiring counsel's withdrawal).

Trial counsel responded to Appellant's bar complaint by letter and met with him in person to resolve the dispute before the trial began. Appellant then told the trial court that he was "very much" satisfied with his counsel's services, and counsel testified at the motion for new trial hearing that the incident "was merely a blip" in their otherwise amicable relationship. Appellant has not shown that his trial counsel had an actual conflict of interest, much less one that adversely affected his lawyer's performance at trial. This claim too has no merit.

*Judgment affirmed. All the Justices concur.*

DECIDED AUGUST 5, 2019.

15

Murder. Cobb Superior Court. Before Judge Poole.

*Justin Wyatt, M. Joel Bergstrom*, for appellant.

*John S. Melvin, District Attorney, Michael S. Carlson, John R. Edwards, Assistant District Attorneys; Christopher M. Carr, Attorney General, Paula K. Smith, Senior Assistant Attorney General, Scott O. Teague, Assistant Attorney General*, for appellee.