308 Ga. 443
FINAL COPY

S20A0218.  HUDSON v. THE STATE.

PETERSON, Justice.

Phell Hudson, Jr., appeals his convictions for malice murder,

possession of a firearm during the commission of a felony, and

making a false statement, all stemming from the shooting death of

Michael Allen.[1] Hudson argues that the trial court erred by failing

---

[1] The crimes occurred on June 11, 2014. Hudson was indicted by a Chatham County grand jury on July 9, 2014, and charged with malice murder, felony murder (predicated on aggravated assault), aggravated assault, two counts of possession of a firearm during the commission of a felony, and making a false statement. A jury trial was held on December 14 to 15, 2015, and Hudson was found guilty of all counts. The trial court sentenced Hudson to life in prison for malice murder, five years concurrent for making a false statement, and five years for possession of a firearm during the commission of a felony to be served consecutive to the life sentence; the aggravated assault counts merged with malice murder, the remaining firearm count merged into the other, and the felony murder verdict was vacated by operation of law. On January 6, 2016, trial counsel timely filed a motion for new trial. On January 13, 2016, appellate counsel filed an additional motion for new trial, which was amended on June 6, 2016. Hudson filed a request to be forensically evaluated, and on July 22, 2016, the trial court entered an order directing the Georgia Department of Behavioral Health and Developmental Disabilities (DBHDD) to conduct a forensic evaluation of Hudson. On November 29, 2016, the DBHDD submitted a report under seal finding that Hudson was competent for the appeals process. Hudson sought an independent evaluation of his mental capacity to be criminally responsible; the independent evaluation was

to instruct the jury on voluntary manslaughter and insanity at the time of the alleged crimes. He also argues that the trial court erred by limiting his cross-examination of a witness. His jury instruction claims fail because the evidence presented at trial did not include even slight evidence to support either charge. And his cross-examination claim fails because any error was harmless. We affirm.

Viewed in the light most favorable to the jury's verdicts, the trial evidence showed the following. On June 11, 2014, around 2:00 p.m., Hudson, Allen, and several other friends were sitting in chairs under a tree drinking beer on the outskirts of the parking lot of the International Longshoreman's Association (ILA), where they were employed at the time. There was a discussion about obtaining more beer. In that conversation, Allen said, referring to Hudson, "I'm trying to get this mother f\*\*ker to take me to the store." Hudson,

conducted on May 18, 2017, concluding that Hudson was criminally responsible. A motion for new trial hearing was held on September 18, 2017. The court denied the motion in an order entered on August 10, 2018. Hudson filed a notice of appeal on September 6, 2018. This case was docketed to this Court's term beginning in December 2019 and submitted for a decision on the briefs.

instantly angered, responded "I'm not gone be a mother f**ker. You know my mother just died." Allen replied, "Man, leave your momma out of this. You know we're just kidding."

Stephen Manes, a longtime co-worker of Allen and Hudson, thought the exchange was done, as the conversation was typical for when the men were drinking in the parking lot. A few minutes later, Hudson walked to his car, where he sat talking to his brother on his cell phone. Hudson got out, went to the trunk and "fumbled around" for a short period, and got back in his car. Hudson then returned to his trunk, grabbed a gun, and walked to Allen and the others, holding his phone in his left hand and a semi-automatic revolver with a red stripe on the handle in his right hand.

Upon reaching the group, Hudson was still on the phone, telling his brother something like "if anything happens, you know where my money is." Hudson then told Allen he would kill him if he did not leave in five minutes; Allen ignored Hudson. Hudson waited five minutes, then kicked Allen out of his chair. At that point, Allen jumped up and Hudson took a swing at him; Allen swung back. The

two men fought for a few minutes, until two shots were fired and Allen fell to the ground. The first shot missed Allen, but the next hit him in the neck. Hudson said to Allen, "I told you I was gone kill your mf***ing behind if you didn't leave." Hudson then got into his car and drove away. Kevin Johnson, another longtime friend and co-worker of Allen and Hudson, called 911; Allen died on the scene from the gunshot wound. The entire incident — from the time Allen insulted Hudson to the time of the shooting — took about thirty minutes.

Eight minutes after the shooting was reported over police radio, Sergeant Mike Arango spotted Hudson's vehicle and pulled him over. Sergeant Arango informed Hudson that he stopped him because his vehicle matched the description of one that was just involved in an incident at the ILA. Hudson denied being at the ILA at all that day, claiming he had been at a friend's house. A dispatch alert came over Sergeant Arango's radio that provided a description of the suspect; the description matched Hudson "to a tee." Sergeant Arango asked Hudson if he had any weapons in the car; Hudson said

that he did, but refused to consent to a search of his vehicle. Sergeant Arango placed Hudson in the back of a patrol car. Hudson was then transported to the police station where he spoke with Detective Robert Santoro.

A search warrant was obtained for Hudson's vehicle; a Taurus .357 Magnum revolver with red marking on the handle was recovered. The gun contained three live rounds and two spent .357 Magnum shell casings.

Manes testified at trial that he did not see Allen with a gun that day. He also never saw Allen bullying or personally bothering Hudson, and was not aware of ongoing issues between Hudson and Allen. Johnson said in 20 years of knowing the men, he never saw Allen bullying Hudson.

1. *The evidence was sufficient to convict Hudson.*

Hudson does not challenge the sufficiency of the evidence. Nevertheless, as is our customary practice in murder cases, we have independently reviewed the record and conclude that the evidence was legally sufficient to authorize a rational trier of fact to find

beyond a reasonable doubt that Hudson was guilty of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979).

2. *The trial court did not err by declining to give jury instructions on voluntary manslaughter and insanity.*

Hudson argues that the trial court erred by refusing to instruct the jury on voluntary manslaughter and insanity at the time of the crimes. A request to charge must be "legal, apt, and precisely adjusted to some principle involved in the case and be authorized by the evidence." *Barron v. State*, 297 Ga. 706, 708 (2) (777 SE2d 435) (2015) (citation and punctuation omitted). "To authorize a requested jury instruction, there need only be slight evidence supporting the theory of the charge." *McClain v. State*, 303 Ga. 6, 9 (2) (810 SE2d 77) (2018) (citation and punctuation omitted). It is a question of law for courts to determine whether the defendant has presented sufficient evidence to warrant a requested charge. See *Ware v. State*, 303 Ga. 847, 850 (III) (815 SE2d 837) (2018). The trial court did not err in declining to give either requested charge.

(a) *Voluntary manslaughter.*

In his written requests for jury instructions, Hudson requested a charge on voluntary manslaughter. Relying on *Johnson v. State*, 297 Ga. 839, 843 (2) (778 SE2d 769) (2015), the court declined to give the charge, saying that "in this particular case, all we have is words. Words cannot result in the sufficient provocation necessary to justify a voluntary manslaughter charge."

Voluntary manslaughter is causing the death of another human being under circumstances which would otherwise be murder when the defendant "acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person[.]" OCGA § 16-5-2 (a). If there is "any evidence, however slight," to support a properly requested charge of voluntary manslaughter, then the trial court must give it. *Johnson*, 297 Ga. at 842 (2) (citation and punctuation omitted). But it is well established that "words alone, regardless of the degree of their insulting nature, 'will not in any case justify the excitement of passion so as to reduce the crime from

murder to manslaughter where the killing is done *solely on account of the indignation aroused by use of opprobrious words*."" *Brooks v. State*, 249 Ga. 583, 585 (292 SE2d 694) (1982) (quoting *Coleman v. State*, 149 Ga. 186, 188 (99 SE 627) (1919)) (punctuation omitted; emphasis in original); see also *Ware v. State*, 303 Ga. 847, 850 (III) (815 SE2d 837) (2018); *Paul v. State*, 274 Ga. 601, 605 (3) (b) (555 SE2d 716) (2001); *Pace v. State*, 258 Ga. 225, 226 (2) (367 SE2d 803) (1988). "[W]e must evaluate the alleged provocation evidence with respect to its effect on a reasonable person, putting aside any peculiar response Appellant may have had." *Johnson*, 297 Ga. at 842 (2). See also *Bailey v. State*, 301 Ga. 476, 480 (IV) (801 SE2d 813) (2017) ("[I]t is of no moment whether the provocation was sufficient to excite the deadly passion in the particular defendant." (citation and punctuation omitted)).

The only evidence that Hudson cites to support such a charge is that Hudson became very angry when Allen called Hudson a "mother f\**ker," because Hudson's mother had recently died. In particular, Hudson cites Manes's testimony that Hudson went

"ballistic" and "really exploded and got really angry" after Allen used that term. Hudson also points to Johnson's testimony that he had "never seen th[e] kind of rage" that Hudson displayed that day and that Hudson was acting "crazy." Allen's use of a crude phrase, no matter how offensive to Hudson, was still only words; Hudson's violent reaction to those words does not change the fact that they were only words. There was no evidence whatsoever of provocation sufficient to excite the passions of a reasonable person that would have entitled Hudson to a charge on voluntary manslaughter. The trial court did not err in denying his request.

(b) *Insanity*.

Hudson also requested a charge on insanity. Hudson pointed to witness testimony that Hudson was "acting crazy," and testimony that he urinated in a trash can at the police station to support a charge of insanity. The trial court found that Manes's testimony that Hudson looked crazy was merely "a you-can't-tell-me-what-to-do look," rather than "the person being criminally insane," and Johnson's testimony "basically describes the individual as being

enraged." The court declined "to make a leap between that language and the charge on insanity." And the trial court concluded there "could be [a] variety of reasons for [Hudson urinating in a trash can], none the least of which is the fact that the gentleman had been drinking underneath a tree with a bunch of his friends and sometimes the net result of that is desire to go." Citing *McBride v. State*, 314 Ga. App. 725 (725 SE2d 844) (2012), the trial court announced that it would not charge on insanity because, in its judgment, the evidence demonstrated that Hudson was "cognizant of what was going on at the time and clearly able to distinguish what was happening and what he was going to do," and "seemed to contemplate the act that was going to occur."

A defendant is presumed to be sane. See *Alvelo v. State*, 290 Ga. 609, 612 (3) (724 SE2d 377) (2012). To establish the affirmative defense of insanity, the defendant must show by a preponderance of the evidence that he was *legally* insane, that is, "at the time of the act, omission, or negligence constituting the crime, the person did not have mental capacity to distinguish between right and wrong in

relation to such act, omission, or negligence[,]" or that, "because of mental disease, injury, or congenital deficiency," he "acted as he did because of a delusional compulsion as to such act which overmastered his will to resist committing the crime." OCGA §§ 16-3-2, 16-3-3. See also *Choisnet v. State*, 295 Ga. 568, 571 (2) (761 SE2d 322) (2014). The delusional compulsion must "be one that, if it had been true, would have justified the defendant's actions." *Choisnet*, 295 Ga. at 571 (2) (citation and punctuation omitted).

It is true that the jury heard testimony that Hudson was "acting crazy" at the time of the alleged offense and urinated in a trashcan at the police station. But there is no evidence that he was *legally* insane or operating under a delusion. See *Jackson v. State*, 301 Ga. 878, 881 (3) (804 SE2d 357) (2017) (no evidence of legal insanity despite arguments that the defendant suffered from schizophrenia and manic depression and that he acted strangely after alleged stabbing); *Phillips v. State*, 255 Ga. 539, 541 (4) (340 SE2d 919) (1986) (defendant not entitled to instruction on insanity despite testimony that he had "mad," "wild," and "unnormal" look).

The trial court determined that Johnson's testimony merely described Hudson as enraged, not criminally insane. And other evidence, including evidence that Hudson told his brother where his money was before shooting Allen, lied to police about being at the ILA, and turned his back from the cameras while urinating in the trash can, suggested that Hudson could tell right from wrong. In the absence of any evidence of legal insanity or delusion at the time the crime was committed, the trial court did not err by declining to give the requested jury instruction.

3. *Any error in limiting cross-examination of a witness was harmless.*

Hudson argues that the trial court erred and denied him his constitutional right of confrontation when it limited his cross-examination of Detective Santoro. More specifically, Hudson argues that he should have been allowed to cross-examine Detective Santoro about whether the detective asked him if he had any mental conditions or a mental illness that would preclude him from talking to the detective. Hudson contends that the detective's testimony on

this point would have been relevant to the defense of insanity because the question was not a question required by the *Miranda*[2] warnings and is an unusual question for an officer to ask.

Defense counsel informed the court that he wanted to ask, "Isn't it true you gave *Miranda*?" adding that he expected the officer to respond affirmatively. Counsel wanted to ask the follow-up question, "But you may ask additional questions given the circumstances of each case; is that correct?" Trial counsel did not proffer an expected response. He next proposed asking, "Well, during *Miranda*, isn't it true you asked him if you're under the influence of alcohol?" He said the officer "asked that question . . . because he knew they were drinking out there that day and he wanted to make sure he was not intoxicated." Finally, counsel wanted to ask, "Isn't it true that you also asked him if he had any mental illness that would keep you from talking to me, and that's all I'm going to ask him. The answer is yes, and I'm through." The State argued, "the trouble with that is he did interview him, and [the jury

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

doesn't] know. The implication, falsely, among the jury will be that [the detective] didn't interview [Hudson] so he must be crazy."

The court agreed with the State and excluded any reference to an exchange between Hudson and Detective Santoro. The court told defense counsel that he could ask Detective Santoro if he had a reason to believe that Hudson had a mental illness, but if the answer was no, he could not follow up and ask, "Isn't it true that you asked [Hudson] if he had a mental illness?" In a post-trial order, the court explained, "the Defendant seemingly tried to bootstrap the affirmative defense of insanity in [through] the testimony of Detective [Santoro]. The Court limited that inquiry in order to prevent confusion or any misunderstanding by the jury."

We review a limitation on the scope of cross-examination for an abuse of discretion. See *Nicely v. State*, 291 Ga. 788, 796 (4) (733 SE2d 715) (2012). But we need not decide whether such an abuse of discretion occurred here, because even if the court erred, any error was harmless. See *State v. Vogleson*, 275 Ga. 637, 641 (571 SE2d 752) (2002) (A "constitutionally improper denial of a defendant's

opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to harmless-error analysis." (citation and punctuation omitted)).

The State must show beyond a reasonable doubt that the error did not contribute to the verdict; "the test is whether the evidence may have influenced the jury's verdict." *Mangum v. State,* 274 Ga. 573, 577 (555 SE2d 451) (2001) (citation and punctuation omitted). The State argues that if any error was committed, it was harmless, because there is no support in the record to suggest that the question or answer was probative of Hudson's insanity defense. We agree.

As discussed above, the only evidence introduced at trial in support of an insanity defense was testimony that Hudson was acting "crazy" and urinated in a trash can. There was no evidence of legal insanity or a mental delusion to warrant a charge on insanity. Assuming Detective Santoro would have responded in the manner that Hudson predicted during the sidebar discussion with the court, it is not at all clear how answers from the detective — who was never qualified as a mental health expert — to the proposed questions

would have changed the court's decision about that instruction. Lay testimony that Hudson was acting "crazy," urinated in a trash can, and was asked an unusual question about mental illness by a police officer does not constitute even slight evidence of legal insanity or a delusion, much less the preponderance of the evidence necessary to establish the affirmative defense. *Choisnet*, 295 Ga. at 572-573 (2) (failure to give insanity jury instruction was unlikely to affect the jury verdict despite evidence that defendant feared the victim would kill him and his mother, and testimony that defendant "may have" been experiencing a psychotic break and possibly was hallucinating at the time of the crime). Because the record does not support a conclusion that any additional evidence elicited through the proposed line of questioning would have affected the jury's verdict, any error was harmless.

*Judgment affirmed. Melton, C.J., Nahmias, P.J., and Blackwell, Boggs, Warren, Bethel, and Ellington, JJ., concur.*

Decided April 6, 2020.
Murder. Chatham Superior Court. Before Judge Walmsley.
*David M. Burns, Jr.*, for appellant.
*Meg E. Heap, District Attorney, Emily C. Puhala, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew M. Youn, Assistant Attorney General*, for appellee.