NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: October 11, 2023

S23A0753.  Maynor v. The State.

COLVIN, Justice.

Appellant Reginald Genard Maynor appeals his convictions for felony murder predicated on aggravated assault and other crimes related to the shooting death of Marti Stegall, Sr.[1]  This case arises

---

[1] The crimes occurred on July 3, 2015. On October 2, 2015, a Fulton County grand jury indicted Appellant for malice murder (Count 1), felony murder predicated on aggravated assault (Count 2), two counts of aggravated assault (Counts 3-4), two counts of cruelty to children in the first degree (Counts 5-6), three counts of cruelty to children in the third degree (Counts 7-9), and possession of a firearm during the commission of a felony (Count 10). A jury trial was held from February 21 to 24, 2017. At the close of the State's evidence, the trial court granted Appellant's motion for directed verdict as to Count 4 (aggravated assault against A. H.). The jury found Appellant guilty of felony murder predicated on aggravated assault, aggravated assault, two counts of cruelty to children in the third degree (against A. H. and M. S. J.), and possession of a firearm during the commission of a felony. On February 27, 2017, the trial court sentenced Appellant to life in prison with the possibility of parole for felony murder and merged the underlying aggravated assault count into the felony murder conviction for sentencing purposes. Appellant was also sentenced to 12 months in prison for each of the two counts of cruelty to children in the third degree, to be served concurrently with each other and with Appellant's life sentence for felony murder, but the trial court

out of a romantic affair involving two couples residing in the Trestle Tree Village Apartments in Fulton County. The conflict caused by this affair ultimately resulted in Appellant shooting and killing Stegall during a neighborhood Fourth of July celebration which took place on July 3, 2015. At trial, Appellant admitted that he shot Stegall but claimed that he did so in self-defense.[2]

On appeal, Appellant argues that the evidence was insufficient as a matter of constitutional and statutory law to disprove his claim of self-defense. Appellant also contends that he received ineffective assistance of counsel because his trial counsel failed to effectively cross-examine a witness and failed to move for a mistrial when the trial evidence did not substantiate a factual claim made by the

commuted these sentences to time served. Lastly, the trial court sentenced Appellant to five years in prison for possession of a firearm during the commission of a felony to be served consecutive to Appellant's life sentence for felony murder. Appellant's trial counsel timely filed a motion for new trial on February 27, 2017, which was subsequently amended by new counsel on April 15, 2021. After a hearing, the trial court denied the amended motion on December 5, 2022. Appellant filed a timely notice of appeal. The case was docketed to this Court's April 2023 term and submitted for a decision on the briefs.

[2] Appellant testified at trial that he shot the victim both in self-defense and by accident. On appeal, however, Appellant does not argue that the shooting was accidental.

prosecutor in his opening statement. Appellant also asks that we consider the prejudicial effect of trial counsel's errors cumulatively. For the reasons stated below, we affirm.

1. Viewed in the light most favorable to the jury's verdicts, the evidence at trial showed the following. Appellant lived in the Trestle Tree Village Apartments with his children and his long-term romantic partner, Laquetta Holt. Appellant was a long-haul truck driver and was often away on assignments. Separately, Stegall had a 14-year relationship with Katisha Gray, who lived in the Trestle Tree Apartments with her three children: 13-year-old J. M., eight-year-old M. S. J., and three-year-old M. S. At the time of the shooting, Katisha's 20-year-old niece, Iyonna Little, also lived at the apartment. According to Katisha, Stegall did not live with her at the time of the shooting but "would come sometimes."

At some point in 2013 or 2014, Stegall began an affair with Appellant's partner, Holt. Appellant discovered the affair when he found a text message from Stegall to Holt on Holt's phone. Appellant later informed Katisha about the affair, to their mutual dismay.

3

Several months before the shooting, in February or March of 2015, Appellant met with Katisha about the affair. The meeting took place while Katisha was visiting with her sister, Mackiyona Gray, who also lived at the Trestle Tree Apartments. Dwiesha Johnson was also present and later testified regarding Appellant's visit. During Appellant's visit, he and Katisha discussed their partners' infidelity, and Appellant proposed that he and Katisha "hook up" to get back at them. Katisha rebuffed his advance and testified at trial that "[Appellant] came out and told me that he was going to kill [Stegall]." Appellant had a gun in his waistband at the time he made this threat, and he demonstrated his seriousness by expressing a familiarity with the details of Stegall's life, including where Stegall worked, where Stegall got his dreadlocks styled, and where Stegall's mother lived.

The conflict caused by Stegall's affair with Appellant's partner came to a head during a large neighborhood party for the Fourth of July, which was held on Friday, July 3, 2015. Katisha's daughter, J. M., who regarded Stegall as a father-figure, witnessed the fight

4

between Appellant and Stegall and the subsequent shooting. About two days prior to the shooting, Stegall took J. M.'s phone from her, but indicated that he planned to return it to her at the party. According to J. M., when Stegall arrived to the party in his white Chevrolet Tahoe, "It took him like one to two minutes to get out of his truck because he was trying to find my phone." When he got out of the truck, he told J. M. to come down and get her phone. J. M. was standing on the balcony and her brother, M. S. J., was near the parking lot below, when J. M. saw Appellant approach Stegall and hit him in the face. After being struck, Stegall dropped the liquor bottle that he had been holding, and the two started throwing punches at each other. J. M. did not see any weapons in Stegall's hands. J. M. testified that she heard two gunshots, and the next thing she saw was "[her] stepfather [ ] lying on the ground."

Mackiyona Gray pulled into the Trestle Tree parking lot two cars behind Stegall.[3] According to Mackiyona, Appellant

---

[3] This portion of Mackiyona's testimony was corroborated by security camera footage from the street, which was played for the jury and which

5

approached Stegall and punched him in the face. Stegall then dropped the liquor bottle he was holding and began to fight back. Stegall was on top of Appellant when Mackiyona heard the first gunshot. The two continued to fight, when "they somehow got up," and "[t]here was another shot." Mackiyona then saw Appellant run toward his home. During this time, Mackiyona observed that J. M. and M. S. J. were outside near the fight and that they had a clear view of the scene.

Katisha Gray was in her apartment making drinks with her niece Iyonna Little when the fight started. Katisha testified that she was inside when she heard the first gunshot, followed by people screaming and calling her nickname, "Tootie." She then ran outside, where she saw "[Appellant] shoot [Stegall] and kick him in the face." Katisha did not see Stegall with a firearm that night or know him to carry a firearm. Nor did she see Stegall attempt to strike Appellant with a liquor bottle.

---

captured Stegall's white Chevrolet Tahoe entering the complex at about 10:51 p.m. Another car entered, and then Mackiyona entered the lot in her red two-door Pontiac about 30 seconds after Stegall.

Eleven-year-old A. H. was present for the Fourth of July celebration. He saw Stegall get out of his white truck. Shortly thereafter, A. H. heard what he initially thought were fireworks come near and toward him. An unidentified man then picked up A. H. and ran with him "to the house." A. H. later learned that the objects were bullets, rather than fireworks, when he returned and "saw [Stegall] there dead."

Trestle Tree resident Crystal Jernigan was talking to Appellant in the parking lot when Stegall arrived. Jernigan testified that she was about ten feet away from Stegall, who initially had a bottle of alcohol, his keys, and a cell phone in his hands. She did not see any weapons on him. Jernigan testified that Appellant walked up to Stegall and "swung on him." Jernigan then saw Stegall punch Appellant back, and the two tussled on the ground, when, according to Jernigan, Appellant "pulled the gun and started shooting. . . . [Appellant] then got up off the ground and ran."

Stegall's autopsy was performed by Dr. Karen Sullivan of the Fulton County Medical Examiner's Office. The autopsy revealed

7

that Stegall received two gunshot wounds: one to his torso and one to his left leg. The gunshot wound to Stegall's torso left both "a dense deposition of soot surrounding the entrance wound" as well as stippling on Stegall's skin, collectively indicating a contact wound. The gunshot wound to Stegall's left shin and thigh did not show signs of soot or stippling, which indicated to Dr. Sullivan that "the muzzle of the gun [was] most likely at least three feet away from the skin."

Appellant testified in his own defense. According to Appellant, he was at home in the Trestle Tree Village Apartments for the Fourth of July celebration on an unexpected break from a long-haul trucking assignment. Appellant testified that while he was walking through one of the parking lots, Stegall drove into the lot and nearly hit Appellant with his vehicle. According to Appellant, Stegall did not get out of his vehicle slowly or call up to J. M., as J. M. had previously testified. Appellant testified that Stegall actually jumped out of his vehicle, said to Appellant, "F**k, n***a, what's up now," and pulled out a gun. Appellant knocked Stegall's right hand,

8

in which Stegall held the gun, into Stegall's vehicle, causing Stegall to drop it. Stegall threw a punch at Appellant and missed but then knocked Appellant to the ground with a hard object that Appellant later learned was a liquor bottle. While Appellant was on the ground, he saw Stegall coming toward him, so Appellant reached in his pocket and pulled out his own gun, which he regularly carried or kept in his truck. Appellant then "shot low." Appellant tried to get up, but by that time, Stegall was on top of him, hitting him with the liquor bottle. Appellant "pushed – tried to push him off and the gun went off." When explaining why he felt it was necessary to use his weapon, Appellant stated, "Whatever he hit me with I didn't want to get hit with it again, so, you know, I tried to defend myself as best as I could."

In his testimony, Appellant described his gun as a five-shot revolver, which he kept loaded. Appellant testified that he shot the gun at Stegall twice. After the fight, Appellant returned to his apartment, put the gun in a toolbox on his back porch, "sat down . . . and tried to figure out what just happened and what [he] need[ed]

to do because [he] was scared." Appellant then left the scene. Neither Appellant's revolver nor the pistol Appellant claimed Stegall possessed were ever recovered.

On cross-examination, Appellant confirmed that he discovered the affair between Holt and Stegall when he saw a text message from Stegall to Holt on Holt's phone. Appellant also confirmed that he called Katisha to speak to her about the affair, but Appellant denied that he ever went to Mackiyona's apartment or that he told Katisha he was going to kill Stegall. Appellant further testified that it was Katisha who proposed that they have an affair, rather than Appellant. According to Appellant, Stegall was mad at him on the night of the party because Katisha had sent Appellant text messages containing pornography. Appellant further testified that Stegall addressed Appellant as soon as Stegall got out of his vehicle, rather than calling to J. M.

2. Appellant argues that the evidence presented was constitutionally insufficient to disprove his claim of self-defense beyond a reasonable doubt. Appellant also argues that the evidence

was statutorily insufficient because it was based on "solely circumstantial" evidence and the State failed to "exclude every other reasonable hypothesis save that of [his] guilt" as required by OCGA § 24-14-6. We disagree.

(a) "When evaluating the sufficiency of evidence as a matter of constitutional due process, the proper standard of review is whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *Williams v. State*, 316 Ga. 147, 150 (1) (886 SE2d 818) (2023) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979)). "When a defendant presents evidence that he was justified in using deadly force, the State bears the burden of disproving the defense beyond a reasonable doubt." *Allen v. State*, __ Ga. __, __ (2) (890 SE2d 700, 707) (2023) (citation and punctuation omitted). But "it is the role of the jury to evaluate the evidence and decide whether the defendant was justified in using deadly force in self-defense." *Huff v. State*, 315 Ga. 558, 562 (1) (883 SE2d 773) (2023) (citation and punctuation omitted). When doing so, "the jury may reject any evidence in support of a

11

justification defense and accept evidence that a shooting was not done in self-defense." *Gibbs v. State*, 309 Ga. 562, 564 (1) (847 SE2d 156) (2020) (citation and punctuation omitted).  As relevant here, "[a] person is not justified in using force [in self-defense] if he . . . [w]as the aggressor[.]" *Carter v. State*, 310 Ga. 559, 562 (1) (b) (852 SE2d 542) (2020) (quoting OCGA § 16-3-21 (b) (3)).

The State presented evidence from Katisha Gray, Dwiesha Johnson, and Mackiyona Gray that Appellant expressed his intent to kill Stegall in retaliation for Stegall's affair with Holt.  Though the jury did not convict Appellant of malice murder, this evidence supported an inference that Appellant was motivated to instigate a fistfight with Stegall, and it was consistent with Appellant shooting Stegall when Appellant began to lose that fight.  Crystal Jernigan and J. M. each testified that they saw Appellant throw the first punch without provocation from Stegall.  See *Mosby v. State*, 300 Ga. 450, 452 (1) (796 SE2d 277) (2017) ("An aggressor is not entitled to a finding of justification." (citing OCGA § 16-3-21 (b) (3))).  Further, neither Jernigan, J. M., nor Mackiyona saw Stegall with a

gun, and no such weapon was found at the scene. Lastly, Appellant fled the immediate area, from which the jury could infer "'consciousness of guilt, and thus . . . guilt itself.'" *State v. Orr*, 305 Ga. 729, 741 (4) (a) (827 SE2d 892) (2019) (quoting *United States v. Borders*, 693 F2d 1318, 1324-1325 (11th Cir. 1982)). See also *Jenkins v. State*, 313 Ga. 81, 89 (3) (868 SE2d 205) (2022) (same).

Moreover, the only evidence supporting Appellant's affirmative defense was his own self-serving testimony. Though the fight and shooting occurred in the midst of a neighborhood party, no one other than Appellant testified that Stegall tried to hit Appellant with his car; that Stegall verbally instigated a fight after getting out of his vehicle; or that Stegall was armed. The jury was free to disbelieve Appellant's testimony in favor of the State's witnesses. See *Ivey v. State*, 305 Ga. 156, 159 (824 SE2d 242) (2019) ("Issues of witness credibility and the existence of justification are for the jury to determine, and it is free to reject a defendant's claim that he acted in self-defense." (citation and punctuation omitted)). The jurors were also authorized to consider their disbelief in Appellant's

13

testimony — and the inconsistencies between it and the eyewitness accounts of others — as substantive evidence of his guilt. See *Mims v. State*, 310 Ga. 853, 855 (854 SE2d 742) (2021) (noting that "the defendant's testimony, in which he claimed he was justified or provoked into acting, may itself be considered substantive evidence of guilt when disbelieved by the jury, as long as some corroborative evidence exists for the charged offense" (citation and punctuation omitted)). The evidence was therefore constitutionally sufficient to disprove Appellant's self-defense claim beyond a reasonable doubt.

(b) Appellant also contends that the evidence of his guilt failed to satisfy the standard articulated in OCGA § 24-14-6, which requires that, where a conviction is based solely on "circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. But Appellant's conviction was not based solely on circumstantial evidence as he contends. The eyewitness accounts of J. M., Katisha, Mackiyona, and Crystal Jernigan are direct evidence. See e.g.,

14

*Jackson v. State*, 307 Ga. 770, 772 (838 SE2d 246) (2020) (noting that "there was substantial direct evidence . . . in the form of testimony from multiple eyewitnesses identifying [the defendant] as the perpetrator" (citation and punctuation omitted)). And, "if there is any direct evidence presented by the State, the circumstantial evidence statute does not apply in a sufficiency analysis." *Brown v. State*, 314 Ga. 193, 196 (1) (875 SE2d 784) (2022) (citation and punctuation omitted) (holding that the defendant's claim of insufficient evidence under OCGA § 24-14-6 failed because the State did not rely solely on circumstantial evidence). Appellant's statutory insufficiency claim therefore fails.

3. Appellant next contends that he received ineffective assistance of counsel in two ways: his trial counsel failed to fully and thoroughly cross-examine Katisha, and his trial counsel failed to move for a mistrial based on the State's failure to admit evidence in support of a factual claim the prosecutor made in his opening statement.

(a) To succeed on his ineffective assistance claims, Appellant

must show that his counsel's performance was constitutionally deficient and that he was prejudiced by this deficient performance. See *Davis v. State*, 315 Ga. 252, 260-261 (4) (882 SE2d 210) (2022). See also *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). Trial counsel's performance was deficient if he "performed at trial in an objectively unreasonable way considering all the circumstances and in light of prevailing professional norms." *Taylor v.* State, 315 Ga. 630, 647 (5) (b) (884 SE2d 346) (2023) (citation and punctuation omitted). Demonstrating deficient performance is a difficult task because there is "a strong presumption that counsel's representation was within the wide range of reasonable professional assistance." *Monroe v. State*, 315 Ga. 767, 781 (6) (884 SE2d 906) (2023) (citation and punctuation omitted). Overcoming this presumption requires an appellant to show "that no reasonable lawyer would have done what his lawyer did, or would have failed to do was his lawyer did not." *Evans v. State*, 315 Ga. 607, 611 (2) (b) (884 SE2d 334) (2023) (citation and punctuation omitted). Further, "[d]ecisions regarding

16

trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course." *Mathews v. State*, 314 Ga. 360, 368 (4) (877 SE2d 188) (2022) (citation and punctuation omitted). For Appellant to prove that he was prejudiced by his counsel's deficient performance, he "must demonstrate that there is a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different." *Washington v. State*, 313 Ga. 771, 773 (3) (873 SE2d 132) (2022) (citation and punctuation omitted). If Appellant fails to carry his burden on one prong of the *Strickland* test, we need not address the other prong. See id.

(b) Appellant claims that Katisha's responses on cross-examination were misleading. Appellant argues that his counsel was constitutionally ineffective because he failed to ask Katisha follow-up questions and to impeach her with additional evidence that showed that Katisha did not witness the shooting. We are not persuaded that trial counsel's performance was constitutionally deficient.

In her initial testimony at trial, Katisha stated that she was in her kitchen when the fight between Appellant and Stegall began and that she did not see how the fight started or the initial exchange of blows. According to her testimony, she became aware of the incident when she heard the first gunshot, together with people screaming and calling to her by her nickname, saying, "Tootie, Tootie, they fighting; they fighting." Katisha testified that J. M. called to her from the balcony, saying, "My daddy is fighting; my daddy is fighting." Katisha claimed that she then ran downstairs to the parking lot below, where she saw Appellant shoot Stegall, "kick[ ] him in the face, and t[ake] off running."

Later that night, Katisha went to the police station and provided a written statement, which Appellant's trial counsel used to impeach her on cross-examination. At trial, Appellant's counsel showed Katisha a copy of the statement, which said:

> I was in the kitchen when I saw them[4] fighting[.] [B]y the time I got out the door I heard shots (4 or 5)[.] This all

---

[4] Katisha Gray's handwritten statement included an arrow and additional text to show that "them" referred to "Reginald Denard Maynard [sic] and Marti Stegall."

started over sexual relations with Mr. Stegal[l] and LaQuatta [sic] Holt.

Appellant's trial counsel then engaged in the following colloquy with Katisha:

DEFENSE COUNSEL: Okay. So first you tell them that you're in the kitchen; right?

GRAY: Uh-huh.

DEFENSE COUNSEL: And you tell them you saw the fighting in that statement?

GRAY: Yes, in the statement.

DEFENSE COUNSEL: But that's not true?

GRAY: No, it's not true. It's not that I saw them fighting. I heard them saying they were fighting. [ . . . ] And that's when I ran out the door.

DEFENSE COUNSEL: But you told the police you saw them fighting?

GRAY: Uh-huh.

DEFENSE COUNSEL: That's not true?

GRAY: I can't tell you if I saw it or I didn't see it right now. It's all a blur. I don't know.

DEFENSE COUNSEL: And you told – you said that by the time you got there what happened?

19

GRAY: I saw Reginald Maynor shoot —

DEFENSE COUNSEL: No, no. On your statement you said, by the time I got there you said what?

GRAY: I heard shots.

DEFENSE COUNSEL: Okay, so you heard shots, correct?

GRAY: Uh-huh.

DEFENSE COUNSEL: But your testimony before this jury is that saw you Reginald Maynor shoot?

GRAY: Uh-huh.

DEFENSE COUNSEL: But you never said in that statement that you saw him shoot, did you?

GRAY: No, not in this statement.

. . .

DEFENSE COUNSEL: You never told the police in the statement that you saw Reginald Maynor shoot Marti Stegall. You never say that, do you?

GRAY: No, not in this statement.

DEFENSE COUNSEL: Okay. And in there you say you saw them fighting, but you actually didn't see them fighting; correct?

GRAY: In this statement, correct.

20

In other cross-examination about her statement, Katisha also clarified that some of the four or five noises she heard may have been fireworks, rather than gunshots.

At the motion-for-new-trial hearing, Appellant's trial counsel was questioned about his impeachment of Katisha. Appellate counsel confronted trial counsel with two exhibits that were not admitted at trial. First, appellate counsel tendered into evidence an audio recording of an interview between Katisha and Investigator Egbert in which Katisha confirmed that by the time she got outside, the shooting had already occurred, Stegall was lying on the ground, and Appellant was gone. Additionally, appellate counsel tendered Detective Kevin Leonpacher's "Supplement Incident Report," which stated that Katisha identified Appellant in a photograph lineup, but that she "did not witness the shooting." Trial counsel testified that he did not remember Katisha's interview with Investigator Egbert and that he did not recall a specific reason for not confronting Katisha with this evidence at trial. Nor did he recall a specific

reason for not entering Detective Leonpacher's notes into evidence. Trial counsel did surmise, however, that he declined to impeach Katisha with these additional exhibits because "in her statement, she said she didn't see the shooting. So . . . I wouldn't have felt the need to present her with a police report."

The trial court denied Appellant's motion for new trial. In its order, it concluded that Appellant's trial counsel's performance "was objectively reasonable" because trial counsel "was aware of [the] other statements but . . . he had a number of other concerns including that further impeachment would be cumulative, that the witness's response could potentially be harmful, and that multiple other witnesses indicated that Maynor was the aggressor when the unarmed victim was shot."

Appellant argues the trial court made factual errors when it concluded that his trial counsel's performance was objectively reasonable. Contrary to the trial court's findings, Appellant claims, trial counsel could not recall the audio recording of Katisha's interview with Investigator Egbert; whether he was concerned that

22

additional evidence would be cumulative; or whether he was influenced by the strength of the State's multiple eyewitnesses. It was therefore clear error, Appellant argues, to hold that trial counsel's decision to forgo a motion for a mistrial was reasonable.

In addition to the trial court's factual errors, Appellant argues that Katisha's responses on cross-examination were misleading, and that his trial counsel's failure to rectify any misleading impressions with follow-up questions and impeachment evidence constituted deficient performance. Specifically, Appellant contends that Katisha's repeated use of the phrase "no, not in *this statement*" implied that she may have given other statements in which she claimed to have seen the shooting, consistent with her trial testimony, when in fact she gave no statements where she claimed to have seen the shooting.

Even assuming, without deciding, that Appellant is correct about the trial court's factual errors in its order denying Appellant's motion for new trial, we remain unpersuaded by Appellant's ineffective assistance claims because Appellant has not

demonstrated that his trial counsel's performance was constitutionally deficient.

First, in the context of Katisha's testimony as a whole, her repeated use of the phrase "not in this statement" was not misleading and thus further cross-examination was not needed to clarify it. Immediately prior to her cross-examination, Katisha testified that she had given only two statements: an oral statement to a female officer on the scene and a written statement to Detective Leonpacher at the police station. According to Katisha, she gave the "same statement" to both law enforcement officers. Though her claim to have given only two statements was inaccurate — as it omits the interview she later had with Investigator Egbert — the jury did not know this. Based on Katisha's uncontested testimony that she gave only two materially identical statements to law enforcement, the phrase "no, not in this statement" was not misleading because Katisha's own testimony foreclosed the possibility that she had provided different information in some other statement not admitted at trial.

24

Second, we cannot say that trial counsel's failure to further impeach Katisha by means of her interview with Investigator Egbert and Detective Leonpacher's report was so patently unreasonable that no competent attorney would have made the same decision. "Decisions about what questions to ask on cross-examination are quintessential trial strategy and will rarely constitute ineffective assistance of counsel. In particular, whether to impeach prosecution witnesses and how to do so are tactical decisions." *Moss v. State*, 312 Ga. 202, 211 (2) (c) (ii) (862 SE2d 309) (2021) (citation and punctuation omitted) (holding trial counsel's decision to forego further efforts to cross-examine a witness and impeach his testimony was reasonable where such efforts would be fruitless or unnecessary given the damage already done to the witness's credibility and the availability of related evidence from other witnesses); *Moore v. State*, 315 Ga. 263, 269 (2) (d) (882 SE2d 227) (2022) (rejecting an argument that trial counsel's cross-examination of a witness was objectively unreasonable, where the appellant argued that the cross-examination should have been more

25

thorough).

Trial counsel's cross-examination of Katisha established several material differences between her testimony and the written statement that she made on the night of the shooting. First, under the pressure of cross-examination, Katisha conceded that though she testified that she did not see Appellant and Stegall fighting, she wrote in her statement that she did. The pressure applied by Appellant's trial counsel prompted Katisha to admit that she could not "tell . . . if I saw it or I didn't see it right now. It's all a blur. I don't know." Second, Katisha acknowledged on cross-examination that though she testified that she *saw* the shooting, she wrote in her statement that she *heard* shots. Further cross-examination clarified that, though her written statement said she heard four or five gunshots, she did not actually know whether some of the noises she heard were fireworks instead. By pointing out these inconsistencies between Katisha's testimony and her written statement, Appellant's trial counsel effectively questioned Katisha's credibility.

Lastly, because it was undisputed that Appellant shot Stegall,

Katisha's testimony was only material to the extent it conflicted with Appellant's claim of self-defense. In this regard, trial counsel's decision to focus on whether Katisha witnessed the initial fight, rather than the subsequent shooting, was not so patently unreasonable that no competent attorney would have made the same decision. See *Mathews*, 314 Ga. at 368 (4). This claim of ineffective assistance therefore fails.

(c) Appellant also contends that his trial counsel was ineffective because he failed to move for a mistrial with regards to an allegedly prejudicial factual claim the State made in its opening statement but ultimately failed to support with evidence. Appellant also contends that the trial court applied the wrong standard when it evaluated this claim in its order denying his motion for new trial. We disagree with both contentions.

During the State's opening statement, the prosecutor made the following remarks:

> PROSECUTOR: [Appellant] sees Marti's vehicle pull up into the apartment complex. [Appellant]'s angry. He's pissed off about this affair [ . . . . ] And the first thing he

tells Crystal Jernigan when he sees Marti's car pulling up to the apartment complex and parking is, ["]What is all of this s**t that is happening when I'm out of town.["]

He sees Marti's car pull up and he says, "I'm getting ready to check this s**t."

Jernigan's testimony, however, did not proceed as the prosecutor suggested it would. Her testimony, in relevant part, was as follows:

JERNIGAN: Later on that night we were all outside in the parking lot. The kids were popping fireworks and I was in the field not too far from the parking lot, and that's when [Appellant], like, approached me.

. . .

PROSECUTOR: And what did you talk about?

JERNIGAN: He came over. He was like, ["]Crystal, what's really going on. And he was like, what is — why all this s**t be starting out here?["] And I was like ["]what s**t?["] And he was like, ["]I guess as far as the kids was fighting the week before.["] And that was it.

Jernigan's testimony ultimately did not support the State's claim in its opening remarks that Appellant said, "I'm getting ready to check this s**t."

At the motion for new trial hearing, Appellant's trial counsel testified that he was generally familiar with case law unfavorable to

28

motions for mistrial made in such situations. He further testified that even though he did not specifically recall the prosecutor's opening statement or his deliberations related to moving for mistrial, he must have "made the determination" that such a motion would fail.

In its order denying Appellant's motion for new trial, the trial court relied on *Alexander v. State*, 270 Ga. 346, 349-351 (2) (509 SE2d 56) (1998), for the following proposition:

> The general rule is that where a prosecutor does not present evidence to support an allegation in the opening there must be *a showing of bad faith* on the part of the prosecutor and the failure to provide a sufficient general charge that opening statements are not evidence.

(Emphasis supplied). The trial court then applied this rule and concluded that trial counsel's performance was not deficient because there was no evidence that the prosecutor attempted to mislead the jury and because trial counsel's decision to forgo moving for a mistrial was informed by his awareness of case law contrary to the proposed motion. It further concluded that Appellant was not prejudiced by the prosecutor's opening remarks because of the

29

"negligible import of this evidence to [Appellant]'s defense and the substantial independent evidence presented of [Appellant]'s guilt."

Appellant contends that the trial court misstated the applicable law, leading it to erroneously place the burden of proof on Appellant rather than on the State. In *Alexander*, we stated that

> A prosecutor should confine his opening statement to an outline of what he expects admissible evidence to prove at trial, and . . . if a prosecutor departs from these guidelines, a conviction will not be reversed if *the prosecutor acted in good faith* and if the trial court instructs the jury that the prosecutor's opening statement is not evidence and has no probative value. . . . Because it is the prosecutor's duty to abide by this rule . . . we conclude that it is appropriate to *place the burden on the prosecutor to show that the failure to offer this proof was in good faith.*

*Alexander*, 270 Ga. at 349-351 (2) (emphasis supplied). See also *Simmons v. State*, 291 Ga. 705, 709 (6) (733 SE2d 280) (2012) (placing the burden on the State to show its opening remarks were made in good faith); *Jennings v. State*, 288 Ga. 120, 122-123 (4) (702 SE2d 151) (2010) (same). Appellant contends that since the burden falls on the State to show its remarks were made in good faith, the trial court erred when it stated that "there must be a showing of bad

30

faith on the part of the prosecutor" and that trial counsel's performance was not deficient because there was "no evidence that the prosecutor attempted [to] mislead the jury."

Appellant is incorrect. Had Appellant's trial counsel moved for a mistrial, the burden would have fallen on the State to prove that its opening remarks were made in good faith, as Appellant claims. But we are not reviewing an order denying a motion for a mistrial. We, like the trial court below, are instead asked to consider whether Appellant's trial counsel was ineffective for failing to move for a mistrial. And where ineffective assistance is at issue, Appellant has the burden to "establish . . . that his counsel's performance was deficient." See *Davis*, 315 Ga. at 260-261 (4) (citation and punctuation omitted). To do so, he must show that no competent attorney would think that the motion would have failed. See *Premo v. Moore*, 562 U.S. 115, 124 (III) (A) (131 SCt 733, 178 LE2d 649) (2011) (explaining that "the relevant question under *Strickland*" is whether "no competent attorney would think a motion to suppress would have failed." (citation and punctuation omitted)). See also

31

*Morrall v. State*, 307 Ga. 444, 449-450 (2) (836 SE2d 92) (2019) (quoting *Premo*, 562 U.S. at 124 (III) (A)); *Moss v. State*, 298 Ga. 613, 618 (5) (b) (783 SE2d 652) (2016) (citing *Premo*, 562 U.S. at 124 (III) (A)).

Here, Appellant cannot make the required showing because the prosecutor's colloquy with Jernigan quoted above reflects the prosecutor's good-faith effort to elicit the testimony he promised in his opening remarks and Jernigan's deficient response. See *Todd v. State*, 274 Ga. 98, 100 (2) (549 SE2d 116) (2001) (holding that there was no bad faith on the part of the State because the prosecutor had attempted to introduce the promised evidence, unlike *Alexander*).

Moreover, Detective Leonpacher's "Supplement Incident Report" — which Appellant admitted into evidence at his motion for new trial hearing — substantiates the good-faith nature of the State's opening remarks. The Supplement Incident Report summarizes a statement that Jernigan gave to Detective J. Shephard. According to the Report, Jernigan said that she was outside before the shooting, when Appellant walked up to her and

32

gave her a hug. Appellant asked her a question which "apparently refer[red] to the relationship between [Stegall] and Laquatta [sic] [Holt]." And when "[Stegall] arrived in his truck. . . . [Appellant] mumbled something like, 'I'm fixing to check this s**t right now!'" Given Jernigan's reported remarks, the State's opening statement was clearly in good faith. In light of this fact, and the trial court's repeated instructions to the jury that opening statements were not evidence, Appellant's sought-after motion for a mistrial would have been denied, and his trial counsel's performance was not deficient for failing to make such a motion. Appellant's claim for ineffective assistance therefore fails.

(d) Lastly, Appellant asks us to consider the cumulative prejudicial effect of his trial counsel's errors. Because we have not identified any such errors, however, this claim fails. See *Scott v. State*, 309 Ga. 764, 771 (3) (d) (848 SE2d 448) (2020) ("Assessing cumulative prejudice is necessary only when multiple errors have been shown . . . .").

*Judgment affirmed. All the Justices concur.*