**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: August 13, 2024

S24A0565. RUSSELL v. THE STATE.

BOGGS, Chief Justice.

Rendell Russell challenges his 2022 convictions for malice murder and related crimes in connection with the murder of Gregory James with a machete.[1] Russell contends that the evidence was

---

[1] The crimes occurred in the early morning hours on October 27, 2020. On February 25, 2021, a Cobb County grand jury indicted Russell for malice murder, two counts of felony murder, aggravated assault, aggravated battery, possession of a knife during the commission of a felony, cruelty to children in the third degree, theft by taking, and possession of a firearm by a convicted felon. The trial court bifurcated the firearm count. At a trial in March 2022, a jury found Russell guilty of the non-firearm counts, and, after hearing evidence in support of the firearm charge, found him guilty on that count as well. On March 24, 2022, the trial court sentenced Russell to life in prison without the possibility of parole for malice murder, merged the aggravated assault and aggravated battery counts into the malice murder count, and sentenced him to a consecutive term of imprisonment of 5 years for possession of a knife during the commission of a felony, a concurrent term of 12 months for cruelty to children in the third degree, a concurrent term of 10 years for theft by taking, and a consecutive term of 5 years for possession of a firearm by a convicted felon. The felony murder counts were vacated by operation of law. On March 25, 2022, Russell filed a motion for a new trial, which he amended with new counsel on June 16, 2023. After an evidentiary hearing on November 7, 2023,

insufficient to support the verdict and that his trial counsel rendered constitutionally ineffective assistance by failing to seek pretrial immunity from prosecution under OCGA § 16-3-24.2. For the reasons set forth below, we affirm.

1. Viewed in the light most favorable to the jury's verdicts, the evidence at trial showed the following. In the weeks before the killing, Russell had broken up with his girlfriend, Kenisha Shepherd. Russell "said he needed a break," took his belongings from Shepherd's apartment, and claimed that he did not know where his key to Shepherd's apartment was when she asked for it. By Russell's own account following the crimes,[2] he and Shepherd had stopped dating two to three weeks before the crimes. Prior to the night of the crimes, Shepherd had seen Russell only once since

the trial court entered an order denying the motion on December 18, 2023. Russell filed a timely notice of appeal on December 19, 2023, and this appeal was docketed to the April 2024 term and submitted for a decision on the briefs.

[2] At trial, an officer testified about the statements Russell made to police after waiving his *Miranda* rights. See *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

their breakup, when, on October 23, 2020, Shepherd spent 10 to 15 minutes braiding Russell's hair.

On the night of the killing, Shepherd had multiple children staying with her in her living room: R.R., her 3-year-old daughter; A.W., her 13-year-old brother; A.W., her 15-year-old sister; J.C., her 14-year-old cousin; and C.J., her 13-year-old cousin. James, Shepherd's new boyfriend, was also staying with Shepherd that night and was asleep with her in the one bedroom of her apartment in the early-morning hours of October 27.

That evening, Russell sent a text message to Shepherd at 7:48 p.m. on October 26, asking what she was doing; Shepherd replied that she was cooking and asked what he was doing. Russell sent another text at 4:40 a.m. on October 27, saying that he was coming to her apartment, but she did not see this text, which arrived as she and James slept, because the battery in her cell phone had died.

Shepherd awoke sometime in the middle of the night and saw Russell standing at the side of her bed. She pushed him out of her apartment, telling him that she had company. Russell ran down the

3

stairs from the second-floor apartment, as Shepherd watched him to make sure that he left. Shepherd plugged in her cell phone, tried unsuccessfully to awaken James, and sat on the edge of her bed.

However, "before [she] knew it, [Russell] was back." She "immediately rushed to him," asked him what he was doing, and told him to get out. He was carrying a machete. As she told him repeatedly to get out, he pushed past her into her bedroom, reached around her, and tapped James on his foot with the machete and woke him up.

James called Russell an offensive name and told him he needed to leave before he "had some folks" come over, Russell responded that James needed to leave, and "it was going back and forth" between the two men. According to Russell's statement after the crimes, James had a handgun that he waved around, but Russell never feared that James would shoot him. Russell also denied repeatedly that he was "upset" or "crazy" during the confrontation; instead, he said that he was "pissed."

At some point, Russell pushed past Shepherd and charged at James with the machete. James fell into the bedroom closet and cried out. Russell stabbed and slashed James with the machete. During the attack, the gun that James had been carrying discharged once, and the bullet hit a wall on the opposite side of the room. At that point, Shepherd fled, along with the children who had been sleeping in the living room, to her sister's apartment in the same apartment complex.

As officers with the Cobb County Police Department responded at 4:50 a.m. to a call regarding a gunshot, they observed James sliding down the stairs from Shepherd's upstairs apartment and found him "literally covered in blood." Officers dragged him to a safe position behind a police vehicle and went upstairs to secure the apartment and search for additional victims. They found blood in the bedroom closet and a trail of blood through the master bedroom, through the living room, onto the landing outside the apartment, and down the stairs to the ground level.

Following his attack on James, Russell took the machete and James's gun and drove to a friend's apartment nearby. He knocked on his friend's door, which was answered by his friend's sister who was staying there. She noticed that Russell's hand was bleeding badly. Russell took off his clothes, which were wet with blood, in the hallway, and he then took a shower. Meanwhile his friend's sister placed the bloody clothes in plastic bags and placed them either in or next to the kitchen trashcan. His friend's sister asked him repeatedly what had happened, but he would not respond. After Russell had driven away from the crime scene, police officers obtained his name, learned that he frequented an apartment complex a few miles away, and learned that his car had been viewed by a license-plate reader near that apartment complex. Officers located his car in front of the residence where Russell had fled and demanded that he come out. Russell's friend's sister called 911 to talk to them as Russell eventually surrendered himself. Russell's vehicle had blood on the driver's seat and the gear shift. Officers found the machete and James's nine-millimeter handgun hidden in

6

some bushes nearby. Russell had injuries to his hands that he claimed were gunshot wounds, but the emergency medical technician who tended to him concluded that they were actually "lacerations and abrasions," wounds that were consistent with having been inflicted as Russell attacked James with the machete. Russell later admitted that he sustained these wounds to his hands while stabbing James with the machete.

The medical examiner testified that James's cause of death was "multiple sharp and blunt force injuries to the head, torso, and extremities." James had "at least 28 injuries" to his body, including defensive wounds to his hands and arms. He suffered stab wounds, incised wounds, and abrasions throughout his body. These wounds included a stab wound that cut through a rib, cut through his diaphragm, and pierced his liver. Another wound "fractured the temporal lobe" of his head and "also fractured the frontal bone which forms the socket around the eyeball or the orbit." The stabbing and slashing injuries were all consistent with having been inflicted by Russell's serrated machete. The medical examiner testified that,

7

among the other wounds, the cuts to the bones that were damaged would have required "a substantial amount of force."

2. Russell argues that the evidence presented at trial was constitutionally insufficient to support his conviction. In considering a sufficiency of the evidence claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979) (emphasis in original). Russell's particular claim is that the State failed to disprove his justification defense. "When a defendant presents evidence that he was justified in using deadly force, the State bears the burden of disproving the defense beyond a reasonable doubt." *Allen v. State*, 317 Ga. 1, 7 (890 SE2d 700) (2023) (cleaned up). However, "it is the role of the jury to evaluate the evidence and, when doing so, the jury is free to reject any evidence in support of a justification defense" and to accept the evidence that the defendant did not act in self-defense. Id. (cleaned up). See also

*Chambliss v. State*, 318 Ga. 161, 163 (896 SE2d 469) (2023) (holding that, in reviewing the sufficiency of the evidence, we "defer to the jury's assessment of the weight and credibility of the evidence" (cleaned up)). As outlined above, the evidence showed that Russell no longer lived in Shepherd's apartment; that Shepherd told Russell to leave and escorted him out when he came to her apartment in the middle of the night; that Russell ignored Shepherd's pleas for him to leave when he returned the second time shortly afterward; that Russell awakened James by tapping his foot with a machete; that Russell denied being in fear that James was going to shoot him; that Russell pushed past Shepherd to push James into the closet; and that, while James was in the closet, Russell stabbed him with the machete repeatedly before James's handgun discharged. The evidence was sufficient to authorize the jury to conclude that Russell was the aggressor in this case and to reject his claim of self-defense, and the evidence that Russell acted in self-defense was negligible. See *Maynor v. State*, 317 Ga. 492, 497 (893 SE2d 724) (2023); OCGA

9

§ 16-3-21 (b) (3) (holding that a person is not justified in using force in self-defense if he was the aggressor).

3. Russell also argues that his trial counsel rendered constitutionally ineffective assistance by failing to file a pretrial motion for immunity from prosecution under OCGA § 16-3-24.2.[3] That statute generally provides that a person is immune from prosecution for the use of force for any of several permissible reasons, including self-defense. To succeed on such a motion, trial counsel would have had to have shown by a preponderance of the evidence that Russell acted in self-defense. See *Mathis v. State*, 309

---

[3] At the time of the crime, OCGA § 16-3-24.2 stated:

A person who uses threats or force in accordance with Code Section 16-3-21, 16-3-23, 16-3-23.1, or 16-3-24 shall be immune from criminal prosecution therefor unless in the use of deadly force, such person utilizes a weapon the carrying or possession of which is unlawful by such person under Part 2 of Article 4 of Chapter 11 of this title.

See also Ga. L. 2024, p. 543 § 1 (making changes not relevant here) (effective May 2, 2024). See also OCGA § 16-3-21 (addressing situations where a person "reasonably believes that [deadly force] is necessary to prevent death or great bodily injury to himself or herself or a third person or to prevent the commission of a forcible felony").

Ga. 110, 114 (844 SE2d 736) (2020). To prevail on his claim that counsel was ineffective in failing to file a pretrial motion for immunity, Russell must show that his trial counsel performed deficiently and that in the absence of counsel's deficient performance, the result of the case would have been different. See *Strickland v. Washington,* 466 U. S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984); *Mathis,* 309 Ga. at 113-114; *McKenzie v. State,* 284 Ga. 342, 347 (667 SE2d 43) (2008) (holding that a tactical decision by counsel cannot form the basis of an ineffective assistance claim unless it was "so patently unreasonable that no competent attorney would have chosen it").[4]

Trial counsel testified at the motion for new trial hearing that he chose not to file a pretrial immunity motion because he did not

_____

[4] Russell argues that a lower standard of proof would have applied in a pretrial immunity hearing versus at trial, and the State has not challenged that assertion. However, a defendant seeking pretrial immunity from prosecution bears the burden of showing that he or she is entitled to such immunity under a preponderance-of-the-evidence standard. See *Mathis,* 309 Ga. at 114. And at trial the State bore the burden to *dis*prove Russell's claim of self-defense beyond a reasonable doubt. Thus, the standard of proof pretrial would have been *less* favorable to Russell than at trial.

want to reveal his defense strategy to the State or to allow the State an opportunity to cross-examine Russell. See *Dent v. State*, 303 Ga. 110, 119 (810 SE2d 527) (2018) (counsel chose not to subject the defendant to pretrial cross-examination and chose to present the case to the jury rather than pretrial to the trial judge). Although Russell suggests here that witnesses other than himself could have been used to prove his theory of justification, he failed to present any such witnesses or testimony below. Trial counsel testified: "I figured based on the evidence in this case that it was not going to be successful[;] it didn't seem like a close call to me that an immunity motion would be granted and that the case would be dismissed based on that."

Here, Russell has not shown that his counsel's decision not to file an immunity motion was unreasonable. As the facts set out in Division 1 clearly show, Russell's claim of self-defense was significantly undermined by the fact that he let himself into Shepherd's apartment, was asked to leave, returned with a machete, remained when Shepherd asked him again to leave, awakened the

victim by tapping him on the foot with the machete, stated that he was not afraid that the victim would shoot him with the gun that he was "waving around," was "pissed" at the victim for waving the gun and refusing to leave, punched the victim, and then began stabbing the victim. The gun discharged only after Russell had backed the victim into the closet and had begun stabbing him. Given that evidence, which overwhelmingly showed that Russell was the aggressor, there was little chance that an immunity motion would have been granted. Counsel's decision not to file one was therefore not unreasonable. See *Maynor*, 317 Ga. at 497; OCGA § 16-3-21 (b) (3) (providing that a person is not justified in using force in self-defense if he was the aggressor); *Mathis*, 309 Ga. at 114-115 (identifying no deficient performance where trial counsel chose not to file a meritless motion for immunity); *Velasco v. State,* 306 Ga. 888, 892-893 (834 SE2d 21) (2019) (holding that a showing of prejudice requires evidence that the motion would have been meritorious and holding that counsel were not ineffective for failing to file a meritless motion); *Goodson v. State*, 305 Ga. 246, 250-251

(824 SE2d 371) (2019) (concluding that the defendant had failed to show prejudice where he had "not shown a reasonable probability that the immunity motion would have been granted").

And counsel gave another reason for not filing the motion: that he did not want to preview his strategy for the State. That, too, was a reasonable strategic decision. See *Dent*, 303 Ga. at 119. Russell has not shown that his counsel's strategic decisions were so unreasonable that no competent attorney would have made them, and so his claim of ineffective assistance fails.

*Judgment affirmed.  All the Justices concur.*