**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the
# Supreme Court of Georgia

No. S26A0491
Jaye Alexander Williams
v.
The State

On Appeal from the Superior Court of Richmond County
No. 2018-RCCR-395

Decided: May 19, 2026

ELLINGTON, Justice.

Jaye Alexander Williams appeals his convictions for malice murder and possession of a firearm during the commission of a crime in connection with the shooting death of Robert Lee Brown, Jr.[1] Williams contends that the evidence was constitutionally insufficient to support his convictions and that his trial counsel provided constitutionally ineffective assistance. For the reasons

---

[1] The crimes occurred on December 26, 2017. On March 20, 2018, a Richmond County grand jury indicted Williams for malice murder, felony murder, and possession of a firearm during the commission of a crime. After a jury trial that ended on March 28, 2019, Williams was found guilty on all counts. On that same day, Williams was sentenced to serve life in prison without the possibility of parole for malice murder and a consecutive five-year prison term for the firearms count. The felony murder count was vacated by operation of law. Williams filed a timely motion for new trial, which he amended through new counsel on March 3, 2022, and September 19, 2024. The trial court denied Williams's amended motion for new trial on July 1, 2025. Williams filed a timely notice of appeal, and the case was docketed in this Court to the term beginning in December 2025 and submitted for a decision on the briefs.

explained below, we affirm.

1. Viewed in the light most favorable to the verdicts, the evidence presented at trial showed that Williams drove Brittany Woods, the mother of Brown's child, to Brown's house and subsequently killed Brown by shooting him three times, including twice in the back.

Woods and Brown had previously lived together, but the relationship was "toxic," and after they broke up, Woods threatened to kill Brown. On December 25, 2017, Brown was with his girlfriend, Quanda Lane, at his house, where he lived with his cousin Joe Wright. Williams drove Woods and her infant son to Brown's house around midnight. Lane, Wright, and a neighbor heard Woods yelling and cursing outside the home and demanding that Brown wake up and come out. Woods banged on the doors and windows with a mop handle, breaking the window where Brown was sleeping. At one point, Woods took her screaming infant from the back seat of Williams's car and yelled for Brown to come get his son.

Wright told Brown to stay inside, left the house, and asked Woods to leave. Shortly thereafter, Wright left the house to give another cousin a ride to meet a friend. Lane testified that Brown went outside to see if he could calm Woods down. When Wright returned about ten minutes later, he saw Brown outside picking the shirtless infant up off the ground and walking toward Williams's car. While Brown was putting the child into Williams's car, Wright heard Brown say to Woods "what's wrong with you, you got this baby out here in this cold and he's going to get sick." Wright did not see anyone else present or anyone fighting at that point.

Wright retrieved his cigarettes from his car and began to walk toward his house when he heard four gunshots. Wright saw

a young man shooting at Brown as Brown held up his hand, saying "man, what are you doing?" and "why you shoot me[?] Why are you trying to kill me?" Wright heard Williams say "you f**k n****r, I was waiting on you to come out the house." Wright then jumped over the fence to escape being shot himself and heard Woods say to Williams, "I told you to hurt him, not kill him." Wright immediately called the police and gave a statement that night.

Lane testified that she heard the gunshots about 15 to 20 minutes after Brown went outside. From a nearby residence, Joquinn Turner heard Woods's yelling and saw her take the infant out of the car. Turner did not hear a male's voice or see any confrontation between any males before she went inside. About three to four minutes after going inside, Turner heard the gunshots and saw a man run from the scene of the shooting. Turner heard Woods yell for someone to call the police and then say to Brown "oh my God, baby, I'm sorry, I'm sorry, he wasn't supposed to do this. He was only supposed to hurt you, he was only supposed to hurt you, he wasn't supposed to do this." When Turner went to help, Woods said that "her best friend's brother" shot Brown because Brown was supposed to spend Christmas with Woods and their son but she had just found out that Brown was cheating on her.

Brown died at the hospital from gunshot wounds to the center of his back, to his upper chest, and to his left buttock. Police located four shell casings near Williams's car and saw blood on the trunk of the car, the passenger side of the car and near the front wheel of the car on the ground. No guns were found at the scene or inside Brown's house. Inside the car was a black gun lockbox containing ammunition similar to the spent casings.

Williams contacted his mother claiming he had been in a

shootout. She promptly called the police shortly after 1:00 a.m., and Williams was taken into custody without incident at 1:45 a.m. An investigator spoke to Williams, reviewed his *Miranda* rights with him, and obtained his signature at 3:44 a.m., and noted that Williams had no visible injuries or signs of having been in a physical altercation.. Williams told the investigator that, because Brown attacked him and "swung at" him and Woods, he shot Brown several times from about five yards away even though Williams saw no weapon. Williams claimed that Brown yelled out, "I've got guns in the house, and I'm gonna kill everybody out here." Williams told the investigator that he felt like his life was in danger, so he did what he felt was right to protect himself, Woods, and the infant. Williams said he ran from the scene after the shooting because he thought someone else was going to shoot back at him. After Williams called his mother, he threw the gun away as he ran. He was unable to lead the police to the gun, and it was never recovered.

Williams testified at trial as follows. He denied any romantic relationship with Woods, who was his sister's best friend. He claimed he was just giving her and her infant son a ride home from a party that night. But when they left the party, Woods immediately asked Williams to drive her to Brown's house instead of her home because she and Brown were supposed to open Christmas gifts together. Williams asked "are you sure? It's a little late." Woods tried to call Brown, who did not answer, but she still wanted to go to his house, and Williams agreed to take her there. Williams testified that he "did not give it any second thought" because sometimes he would go to other people's houses or they would come to him in the middle of the night.

When they arrived at Brown's house, Williams testified that he remained in the car for about an hour. He testified that

4

he was shocked at Woods's behavior there, as she had never really gotten loud before, and he urged her to get back in the car so they could leave. Williams saw Woods physically punch Brown's face, "swinging at him like Mike Tyson," but at that time did not see Brown swing back at Woods, and he did nothing to intervene because the "situation" had "nothing to do with" him. Williams did not consider calling 911 because everything "started to calm down."

According to Williams, he got out of the car to take the infant to Woods but returned to the car with the child. He was trying to calm the screaming infant down when he felt the car rock and saw that Brown was holding Woods up against the car and that Woods had ripped Brown's shirt. Williams testified that Brown "brought [him] into the situation" when Brown threatened "you know what I do, I have guns in the house, I'll kill everybody out here." Williams, having never been threatened like that before, grabbed his black box with his Smith & Wesson .40-caliber handgun, loaded it, slipped it into his pocket, and got out of his car. Williams saw another car pull into the driveway and saw someone get out. Williams heard Brown say, "Rob or Joe, if he touches me, kill him," and Brown then took off his ripped shirt and threw it to the ground.

Williams further testified that Brown first began striking Woods and then "came at [him], swinging," striking him at least two times including once in the face. But Williams admitted he did not tell the investigator that Brown had punched him in the face when he was interviewed three hours after the murder. Williams claimed that he was bleeding a little from his mouth and had a cut on his hand from blocking punches. When asked why he pulled out his gun, Williams stated, "I felt that my life was in danger with him threatening me and also telling someone else to

cause me harm if I was to touch him" and "it was dark, and I didn't know if he had a weapon stashed in his pants or a knife or anything of that nature." Williams admitted that he never saw a gun in Brown's hand.

Williams did not try to calm Brown down or tell him that he just wanted to leave, nor did Williams tell Brown to back off, tell him that he had a gun, show him the handgun, or say anything to Brown. Williams testified that he was backing away from Brown as Brown was hitting him and that he then pulled his gun from his pocket and shot Brown multiple times. Williams denied thinking Brown was going to get a weapon, claimed not to know if Brown had a weapon, and admitted that he shot Brown because of the verbal threats. Williams denied that he threatened Brown or that he and Woods had a plan to harm Brown or scare him. When asked why he fired four times at Brown, Williams said he did so to defend himself and did not decide to shoot a particular number of times. And when asked why he fled, Williams said he panicked and did not know if a second person was going to come after him. Williams did not know that he had shot Brown in the back, as everything happened quickly. Williams stated that he simply dropped his handgun as he ran from the shooting and did not stop to pick it up. Williams did not attempt to call 911 after the shooting but did call three other persons. Williams testified, "I defended myself because [Brown] attacked me after giving two threats," and "Had I not defended myself, I could have died."

Williams contends that the evidence was constitutionally insufficient to support his convictions because the State did not disprove self-defense beyond a reasonable doubt. "We evaluate a due process challenge to the sufficiency of the evidence by viewing the evidence presented at trial in the light most favorable to the verdicts, and asking whether any rational trier of fact could have

found the defendant guilty beyond a reasonable doubt." *Whisnant v. State*, 322 Ga. 253, 257 (2025) (quotation marks omitted). "Conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be derived from the facts are for the jury to resolve." Id. (citation and punctuation omitted). "When a defendant presents evidence that he was justified in using deadly force, the State bears the burden of disproving the defense beyond a reasonable doubt." *Allen v. State*, 322 Ga. 417, 422 (2025) (quotation marks omitted). "But it is the role of the jury to evaluate the evidence and decide whether the defendant was justified in using deadly force in self-defense." *Maynor v. State*, 317 Ga. 492, 497 (2023) (quotation marks omitted). And "when doing so, the jury is free to reject any evidence in support of a justification defense and to accept the evidence that the defendant did not act in self-defense." *Allen*, 322 Ga. at 423 (quotation marks omitted). Under OCGA § 16-3-21(b)(3), "a person is not justified in using force in self-defense if he was the aggressor." *Maynor*, 317 Ga. at 497 (citation and punctuation omitted).

Williams argues at some length that his account of the shooting—including threats, menaces, and attacks by Brown—was not inconsistent with certain evidence presented by the State and showed Williams's reasonable belief that deadly force was necessary to prevent death or great bodily harm. But the jury was free to reject Williams's self-serving testimony that Brown attacked him and Woods first, especially when it was the only such evidence and was inconsistent with the eyewitness testimony. See *Allen*, 322 Ga. at 423 (holding that the evidence was sufficient to authorize the jury to find beyond a reasonable doubt that the appellant did not act in self-defense where his self-serving testimony was inconsistent with his prior admissions and with the testimony of multiple eyewitnesses); *Maynor*, 317 Ga. at

497–98 (holding that the evidence was constitutionally sufficient to disprove the appellant's self-defense claim beyond a reasonable doubt where his self-serving testimony—that the victim tried to hit him with a car, verbally instigated a fight, and was armed—was the only evidence supporting his affirmative defense and was inconsistent with the other eyewitness accounts). Moreover, "the jurors were also authorized to consider their disbelief in [Williams's] testimony—and the inconsistencies between it and the eyewitness accounts of others—as substantive evidence of his guilt." *Maynor*, 317 Ga. at 498. The evidence therefore was constitutionally sufficient for the jury to find beyond a reasonable doubt that the State disproved self-defense.

2. Williams also contends that his trial counsel provided constitutionally ineffective assistance when she failed to investigate and present evidence supporting voluntary manslaughter as an alternative defense theory and when she failed to request a jury charge on voluntary manslaughter. Assuming without deciding that Williams preserved these issues for review, we see no merit in this contention for the following reasons.

To prevail on a claim of ineffective assistance of counsel, a defendant must show that his counsel's performance was deficient and that the deficient performance prejudiced him. *Strickland v. Washington*, 466 US 668, 687 (1984). To satisfy the deficiency prong of the *Strickland* test, a defendant must demonstrate that trial counsel "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Butler v. State*, 313 Ga. 675, 683 (2022) (quotation marks omitted). To prove prejudice under *Strickland*, a defendant must demonstrate "a reasonable probability that, but for counsel's deficiency, the result

8

of the trial would have been different." *Burke v. State*, 320 Ga. 706, 708 (2025) (quotation marks omitted). And, if a defendant fails to make a sufficient showing on one prong of the *Strickland* test, we need not address the other prong. *Starks v. State*, 320 Ga. 300, 304 (2024).

OCGA § 16-5-2(a) defines "voluntary manslaughter" as the killing of another person under circumstances that would otherwise be murder when the killer "acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person." "To warrant a jury charge on voluntary manslaughter, there must be at least slight evidence that the accused was so influenced and excited that he reacted passionately rather than simply in an attempt to defend himself." *Stapleton v. State*, 323 Ga. 380, 388 (2026) (quotation marks omitted).

Williams primarily argues that his trial counsel failed to investigate and present evidence about his mental health—which he asserts was relevant to voluntary manslaughter—related to his father's childhood abuse of him and his sister, his military service, and his potential PTSD. However, even if such mental health evidence had been presented at trial, it could not have provided any support for a verdict of voluntary manslaughter. "[W]e must evaluate the alleged provocation evidence with respect to its effect on a reasonable person, putting aside any peculiar response Appellant may have had." *Johnson v. State*, 297 Ga. 839, 842 (2015). Thus, "this Court has consistently held that evidence of a defendant's subjective mental condition or mental illness is not relevant to a claim of voluntary manslaughter." *Collins v. State*, 306 Ga. 464, 467 (2022). See also *Riggs v. State*, 306 Ga. 759, 763 (2019) (holding that evidence of "an alleged incident [of sexual abuse] occurring many years earlier ... was

9

simply not relevant to the jury's determination regarding voluntary manslaughter," and "in the absence of an insanity defense ... , [the defendant] cannot demonstrate that this evidence was relevant to show his alleged subjective mental state"); *Johnson*, 297 Ga. at 842–43 (citing cases holding that the defendant's "fragile mental state" or psychological evidence about the effect of the victim's conduct on the defendant's mental state at the time of the killing was irrelevant to a voluntary manslaughter defense). In light of these precedents, efforts to investigate and present evidence related to Williams's abuse and PTSD allegations "in the hope of obtaining a jury instruction on voluntary manslaughter would have been a waste of time, and trial counsel's failure to do so was therefore neither deficient nor prejudicial." *Collins*, 306 Ga. at 467.

Williams also claims that the evidence presented at trial warranted a charge on voluntary manslaughter and that trial counsel's failure to request such a charge amounted to ineffective assistance. We disagree. "A charge on voluntary manslaughter is not available to a defendant whose own statement unequivocally shows that he was not angered or impassioned when a killing occurred, and when the other evidence does not show otherwise." *Stapleton*, 323 Ga. at 388 (quotation marks omitted). Williams "never testified that he was angry or mad or that he had any other response showing he might have reacted passionately." Id. (quotation marks omitted). Instead, he consistently claimed that his life was in danger and he shot Brown to defend himself. Williams's story about Brown's threats and attacks furnish some support for Williams's self-defense claim but not for voluntary manslaughter. See id. ("Acting out of fear of bodily harm is not the same as acting in the heat of passion, and only evidence of the latter supports a voluntary manslaughter conviction." (citation and punctuation omitted)); *Anderson v. State*, 319 Ga. 56, 61

10

(2024) ("[T]hreats and insults on their own are not enough to support a voluntary manslaughter instruction."); *Smith v. State*, 296 Ga. 731, 737 (2015) ("[N]either fear that someone is going to pull a gun nor fighting are the types of provocation which demand a voluntary manslaughter charge."). "Trial counsel was not deficient for failing to request a charge on voluntary manslaughter because there was no evidence to support the charge." *Powell v. State*, 307 Ga. 96, 105 (2019).

*Judgment affirmed. All the Justices concur, except Warren, P.J., not participating.*

11